**Jay OLSEN, Plaintiff,**

v.

**OHIO EDISON COMPANY, Defendant.**

No. 1:95–CV–1928.

United States District Court,
N.D. Ohio,
Eastern Division.

Sept. 30, 1997.

J. Eric Fleischauer, Marc L. Fleischauer, Mansfield, OH, for Jay Olsen.

Gary W. Spring, Aretta K. Bernard, Roetzel & Andress, Akron, OH, Gary D. Benz, Ohio Edison Co., Akron, OH, for Ohio Edison Co.

## *OPINION & ORDER*

O'MALLEY, District Judge.

Plaintiff Jay Olsen brings this action against defendant Ohio Edison Company ("Ohio Edison"). Olsen alleges that Ohio Edison violated the Family and Medical Leave Act of 1993, 29 U.S.C. Sec. 2611 *et seq.* ("FMLA"), when it suspended and terminated his employment. Olsen has moved for partial summary judgment as to Ohio Edison's liability pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. Ohio Edison, also pursuant to Rule 56(c), has moved for summary judgment with respect to Ol-

sen's complaint. For the reasons that follow, Ohio Edison's motion for summary judgment (docket # 19) is **GRANTED,** and Olsen's motion for partial summary judgment (docket # 20) is **DENIED.**

## I.

The following material facts are not in dispute. Olsen began working for Ohio Edison in 1989 as a meter reader, a job that required him to travel from house to house recording the amount of electricity used by customers at each location. At some point on June 8, 1994, Olsen alleges he was injured while on his meter reading route.[1] That evening, Olsen went to the emergency room at Ashland Samaritan Hospital complaining of back and chest pain. After treating him, the emergency room physician wrote Olsen a prescription for Motrin 600, a prescription analgesic used to reduce inflammation. The physician also wrote Olsen a note excusing him from work on Thursday, June 9, and allowing him to return on Friday, June 10, as long as he only performed light duty. The note further stated that Olsen would be able to return to work in full capacity on or after Saturday, June 11.[2] In the early morning hours of June 9, Olsen called his supervisor, George McFadden, and told him that he had been to the emergency room the night before and that a doctor told him he could not work that day. Olsen did not work on Thursday, but, pursuant to the doctor's instructions, Olsen returned to work on Friday, June 10 and performed light tasks, like filing. He apparently completed the day without incident.

Over the weekend, Olsen made an appointment to see his chiropractor, Dr. Schmidt, and apparently spoke with him on Saturday. At 9 p.m. on June 12, the day before he was to return to full-duty status, and before having been seen by Dr. Schmidt, Olsen called McFadden, and told him that his chiropractor had prohibited him from working through Thursday, June 16, even though the emergency room physician had said Olsen could return on Monday, June 13. Consequently, Olsen informed McFadden that he would not be coming to work on Monday. This was the first time Olsen told Ohio Edison that he intended to seek further treatment or that he would need additional time off On Monday, Olsen visited Dr. Schmidt in his office.

The Superintendent of the Mansfield office where Olsen worked, David Glasser, called Dr. Schmidt's office to confirm that he had excused Olsen from work for most of the week. Contrary to what Olsen told McFadden, Dr. Schmidt's office informed Glasser that Olsen was fit to perform light, administrative jobs. Thus, Dr. Schmidt issued an excuse on June 13 that allowed Olsen to work half-days on light tasks.

Olsen returned to work on June 14, and produced the excuse written by Dr. Schmidt. The excuse recited the above work restrictions and stated that Olsen's injuries consisted of cervical, thoracic and lumbar strains/sprains and intercostal neuralgia. In conformance with Dr. Schmidt's recommendation, Ohio Edison assigned Olsen to work only light, administrative tasks for half-days. Even so, on June 14, after complaining of back pain, Olsen was given permission to leave after working fewer than two hours. He returned on June 15, but again left after fewer than two hours. This time he did not have permission to leave. On June 16, Olsen showed up for work with another excuse from Dr. Schmidt, this time extending the time period in which he was to work light duty to June 27. Although Dr. Schmidt had consistently approved Olsen to work half days, again Olsen left work after only a few hours, and, again, he did so without first telling anybody he was leaving or obtaining permission to leave. Because these actions (leaving work without authorization or medical excuse) constituted a violation of Ohio Edison leave policy, Olsen was suspended indefinitely, pending further investigation of his injury claims.

Two days after being suspended, Olsen visited his family physician, Dr. Adkins, and told him that he was suffering from back pain and had been experiencing difficulty urinating. Suspecting that the Motrin 600 might be the cause of Olsen's urination trou-

---

1. How Olsen was injured is the subject of dispute.

2. Olsen did not work on weekends, so essentially the doctor allowed him to return to full duty on Monday, June 13.

bles, Dr. Adkins prescribed a different analgesic, Naprosyn 500. On Monday, June 20, Olsen participated in a meeting investigating his claims of back pain. At that meeting, Olsen signed an authorization that gave Ohio Edison permission to access his medical records. After contacting an attorney, Olsen subsequently revoked his authorization and told his doctors not to release his medical records if requested to do so by Ohio Edison.

On July 1, 1994, Ohio Edison wrote to Olsen and explained that, if he failed to provide a diagnosis and prognosis to them by July 7, 1994 that justified his absences, he would be considered to have abandoned his job and would be terminated as a result. Although he claims that he attempted to comply with the company's ultimatum, Olsen complains that he did not have sufficient time within which to do so. Thus, Olsen failed to respond timely. He was terminated by a letter dated July 11, 1994 for excessive absenteeism and filed this suit more than one year later, on August 30, 1995.

## II.

Rule 56(c) of the Federal Rules of Civil Procedure dictates that, where summary judgment is sought:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

While all evidence must be viewed in the light most favorable to the non-moving party, summary judgment is appropriate whenever that non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "In other words, the movant [can] challenge the opposing party to 'put up or shut up' on a critical issue. After being afforded sufficient time for discovery, as required by Fed.R.Civ.P. 56(f), if the re-

spondent [does] not 'put up,' summary judgment [is] proper." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

In this context, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* at 1479–80 (citing *Frito–Lay, Inc. v. Willoughby,* 863 F.2d 1029, 1034 (D.C.Cir.1988)). The trial court need not seek out factual disputes nor speculate on the possibility that, under some as yet unstated scenario, a meaningful factual dispute might somehow arise. The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established, which create a genuine issue of material fact. *See Fulson v. City of Columbus,* 801 F.Supp. 1, 4 (S.D.Ohio 1992).

## III.

Enacted in 1993, the FMLA represents an attempt to reconcile "the demands of the workplace with the needs of families." 29 U.S.C. § 2601(b)(1). Thus, while Congress sought to provide employees with the right to "take reasonable leave for medical reasons," it also sought to do so "in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b)(2) & (3).

Under the Act, an eligible employee [3] is entitled to take up to 12 weeks of leave during any 12-month period for one or more of the following reasons:

(A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.

(B) Because of the placement of a son or daughter with the employee for adoption or foster care.

(C) In order to care for the spouse, or son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.

(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

---

**3.** It is undisputed that Ohio Edison is a covered employer and that Olsen was a covered employee.

29 U.S.C. § 2612. In this case, the controversy revolves around whether Olsen had a "serious health condition."

The FMLA supplies the following definition of "serious health condition":

an illness, injury, impairment, or physical or mental condition that involves—

(A) inpatient care in a hospital, hospice, or residential medical care facility; or

(B) continuing treatment by a health care provider.

29 U.S.C. § 2611.

Because the meaning of the statute is not clear on its face, the Court must turn to other interpretive guides for counsel on what is and is not covered by the Act. According to the legislative history, Congress did not intend to include within the FMLA's protections "minor illnesses which last only a few days and surgical procedures which typically do not require hospitalization and require only a brief recovery period." H.R.Rep. No. 8, 103rd Cong., 1st Sess., pt. I at 29 (1993). The slings and arrows of everyday life, in Congress' view, should not be the stuff of a federal statute, nor federal litigation based on it. Rather, Congress believed that quotidian afflictions like the common cold or flu should "be covered by even the most modest of employer sick leave policies" and chose not to legislate in that area. *Id.*

Representative of the types of illnesses Congress envisioned would be covered by the Act are the following:

heart attacks, heart conditions requiring heart bypass of valve operations, most cancers, back conditions *requiring extensive therapy or surgical procedures*, strokes, severe respiratory conditions, spinal injuries, appendicitis, pneumonia, emphysema, severe arthritis, severe nervous disorders, injuries caused by serious accidents on or off the job, ongoing pregnancy, miscarriages, complications or illnesses related to pregnancy, such as severe morning sickness, the need for prenatal care, childbirth and recovery from childbirth.

H.R.Rep. No. 8, 103rd Cong., 1st Sess., pt. I at 29 (1993) (emphasis added). While this list is illustrative and not exhaustive, it does shed light on what is *not* covered. For instance, arthritis is not necessarily covered, but *severe* arthritis is. The run-of-the-mill backache is not covered, but a backache so severe that surgery or *extensive* therapy are required is. Obviously, Congress did not intend for an employee to stand on his or her FMLA rights whenever a need for aspirin or cold tablets arose.[4]

■ The administrative regulations promulgated by the Secretary of Labor provide additional, controlling[5], authority as to what does and does not constitute a "serious health condition." In this case, the Court examines the interim, rather than the final, regulations.[6] According to the interim regulations, a "serious health condition" is "an illness, injury, impairment, or physical or mental condition that involves" one of the following:

(1) Any period of incapacity or treatment in connection with or consequent to inpa-

---

**4.** Indeed, although not controlling in this case, the final regulations do suggest as much: "A regimen of continuing treatment that includes the taking of over-the-counter medications such as aspirin ... that can be initiated without a visit to a health care provider, is not, by itself, sufficient to constitute a regimen of continuing treatment for purposes of FMLA leave." 29 C.F.R. § 825.114 (1995).

**5.** According to the Fifth Circuit, one of the few federal appeals courts to have considered the scope and meaning of FMLA's provisions, the regulations must be consulted because of the Act's ambiguity: "Administrative regulations promulgated in response to express delegations of authority, like the one at issue here, 'are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.'" *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758,

763 (5th Cir.1995) (quoting *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

**6.** Although the final regulations became effective February 6, 1995, *see* The Family and Medical Leave Act of 1993, 60 Fed.Reg. 2180 (1995), the interim regulations apply here because Olsen's termination occurred prior to the release of the final regulations, which are not to be given retroactive effect. *See Schlett v. Avco Financial Services, Inc.,* 950 F.Supp. 823, 835 (N.D.Ohio 1996); *Robbins v. Bureau of Nat'l Affairs, Inc.,* 896 F.Supp. 18, 21–22 (D.D.C.1995). *Compare Manuel,* 66 F.3d at 761 n. 2 (noting that the interim regulations govern actions where the operative facts occur prior to release of the final regulations).

tient care ... in a hospital, hospice, or residential medical care facility;

(2) Any period of incapacity requiring absence from work, school, or other regular daily activities, of more than three calendar days, that also involves continuing treatment by (or under the supervision of) a health care provider; or

(3) Continuing treatment by (or under the supervision of) a health care provider for a chronic or long-term health condition that is incurable or so serious that, if not treated, would likely result in a period of incapacity of more than three calendar days....

29 C.F.R. § 825.114(a) (1993) (emphasis added).

The parties agree that only the definition appearing in 29 C.F.R. § 825.114(a)(2) is pertinent here. Thus, Olsen claims he suffered a period of incapacity requiring absence from work for more than three calendar days, for which he received "continuing treatment by a health care provider." In this context, the meaning of "continuing treatment by a health care provider" has engendered much debate and, not surprisingly, much litigation. *See* Carol Ann Humiston, "Emerging Issues Under the Family and Medical Leave Act," 43 Fed. Law. 35 (June 1996). According to the interim regulations, there are three alternative definitions, two of which are of potential relevance here:

(1) The employee ... is treated two or more times for an injury or illness by a health care provider. Normally, this would require visits to the health care provider or to a nurse or physician's assistant under direct supervision of the health care provider.

(2) The employee ... is treated for the injury or illness by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of a health care provider—for example, a course of medication or therapy—to resolve the health condition....

29 C.F.R. § 825.114.

Both Ohio Edison and Olsen attempt to support their respective positions by focusing on whether Olsen received "continuing treatment." For instance, Ohio Edison argues that Olsen did not have a "serious health condition," because: (1) Olsen was not admitted to a hospital because of his alleged injuries; (2) he did not receive "continuing treatment" by a "health care provider," as those terms are understood by the applicable regulations; and (3) he did not receive "continuing treatment" from a "health care provider" for a chronic or long-term health condition that is incurable.

Olsen, on the other hand, contends that he satisfies the requirement of "continuing treatment" in four ways: (1) his single visit to Ashland Samaritan's emergency room is enough by itself because the Motrin prescription and recommendation to "follow up" with his family doctor constituted a "regimen of continuing treatment under the supervision of a health care provider"; (2) his family doctor, Dr. Adkins, prescribed another analgesic, which Olsen says constitutes continuing treatment for the same reason; (3) he was treated by both Dr. Adkins and the emergency room physician, which constitutes the alternative definition of continuing treatment, defined as "treat[ment] two or more times ... by a health care provider"; and, finally, (4) his seven visits to Dr. Schmidt, his chiropractor, also satisfy the definition of "treat[ment] two or more times."

■ Before the Court even considers the "continuing treatment" prong of the definition of serious medical condition set forth in 29 C.F.R. § 825.114(a)(2), however, Olsen must first demonstrate that he suffered from a period of incapacity within the meaning of that regulation. Under the plain language of the statute and regulations, this is the *threshold* consideration. Again, 29 C.F.R. § 825.114(a)(2) defines a "serious health condition" as "[a]ny period of incapacity requiring absence from work ... that *also* involves continuing treatment by (or under the supervision of) a health care provider." (emphasis added). The interim regulations thus require a plaintiff to make a two-pronged showing of *both* an incapacity requiring absence from work *and* continuing treatment. Indeed, it is only where an incapacity is shown that the Court need proceed to a consideration of whether the employee received "continuing treatment" within the meaning of the Act. Thus, construing the facts in a light most favorable to Olsen, if he fails to show

that he had an illness or injury which incapacitated him for more than three days, the Court's inquiry is over and summary judgment is appropriate.[7]

Olsen claims he was incapacitated because, pursuant to the emergency room physician's and his chiropractor's orders,[8] he was allegedly unable to work in full capacity from June 8 through June 27, 1994. Only if he establishes that his back pain "required" him to be absent from work for that time period, can he satisfy this prong of the analysis.

■ The Court first considers the treatment provided by the emergency room physician. The undisputed evidence in this case clearly establishes that the emergency room physician prohibited Olsen from working for only one day, allowed him to work light duty the next, and said that he could go back to his full duties after that. Thus, even assuming, *arguendo*, that light duty days should be included in determining whether an employee was required to miss work for more than three days—an issue the Court does not resolve here—Olsen has not satisfied the requirement of an incapacity for more than three days based on the emergency room physician's recommendation. *See* 29 C.F.R. § 825.114(a)(2). Olsen counters, however, that his chiropractor, Dr. Schmidt, placed him on light duty for a significant period of time, and, if that is included in the calculation, then he actually was incapacitated for nineteen days, far in excess of the FMLA's requirement.

■ The interim regulations state that the incapacity must "require" the employee to be absent from work for more than three calendar days. Even assuming that Olsen is correct that "light duty" is the equivalent of absence from work, his chiropractor's note, by itself does not demonstrate that Olsen was *required* to miss work because of his injury. To demonstrate this fact, Dr. Schmidt's conclusion must have been made

while he was acting as a "health care provider" and be supported by a professional assessment of the limitations actually required by Olsen's condition. *See Brannon v. Osh-Kosh B'Gosh, Inc.*, 897 F.Supp. 1028, 1037 (M.D.Tenn.1995) (an employee cannot show a "required" absence unless a health care provider authorizes a period of absence that exceeds three (3) days); *Seidle v. Provident Mutual Life Ins. Co.*, 871 F.Supp. 238, 244 (E.D.Pa.1994) (where health care provider only required that child stay home for three (3) days, day care center's own determination to mandate a fourth day of absence because of lingering symptoms was insufficient to satisfy the "required" absence prong).

*Brannon* is illustrative of how this requirement is to be applied. There, the employee was fired for excessive absenteeism. She sued her employer alleging violation of the FMLA, basing her claim both on her own illness and that of her daughter. She claimed that both her own gastroenteritis and upper respiratory infection and her child's throat and upper respiratory infections constituted "serious health conditions" that guaranteed her time off under the FMLA. To support her claim that her own condition was a "serious health condition," the plaintiff pointed out that she had seen a medical doctor and had been given three prescription drugs. Both the employer and employee filed motions for summary judgment. The Court denied the employer's motion and granted the employee's motion with respect to liability. In doing so, however, the Court agreed that the employee's own illness did not constitute a serious illness; liability was founded, instead, upon the child's illness.

The *Brannon* Court based its conclusion that the employee's illness was *not covered* under the FMLA on two factors: first, even though she had been absent from work for more than three days, the employee's physician had not advised that she do so[9]; and

---

7. Olsen has the burden of demonstrating the existence of an injury resulting in incapacity. In order to survive summary judgment, let alone prevail on his own summary judgment motion, Olsen must "demonstrate that he possesses a statutory right, created affirmatively by the provisions of the FMLA, that has been violated." *Kaylor v. Fannin Regional Hosp., Inc.*, 946 F.Supp. 988, 997 (N.D.Ga.1996).

8. Significantly, Olsen makes no claim that Dr. Adkins, his family doctor, instructed him to miss work.

9. The Court reached this conclusion even though the physician later speculated that "it was reasonable for someone to miss three or four days for [the plaintiff's] type of illness." *Brannon*, 897 F.Supp. at 1037.

second, the plaintiff's only "proof" that she was too sick to work was her own testimony, which the Court found to be insufficient to satisfy her burden on summary judgment—even though it also was undisputed that she had been given three prescriptions by a medical doctor. For purposes of the FMLA, the Court distinguished between the employee's illness and that of the child. The Court found that the child had seen a health care provider who instructed the child to miss two days of day care, after taking a medical history that indicated the child already had been running a fever for three (3) days or more (at least one of which was during the previous work week).[10] The Court concluded that, under the circumstances, it could not say, as a matter of law, that the first prong of plaintiff's showing—i.e., a condition which incapacitated plaintiff or a family member for over three days, thereby "requiring" plaintiff's absence from work—had not been satisfied. *See id. See also George v. Associated Stationers*, 932 F.Supp. 1012, 1016 (N.D.Ohio 1996) (explaining the two-pronged showing a plaintiff must make out and denying defendant's motion for summary judgment on ground that plaintiff had established both prongs).

■ Under this standard, in order to show that he or she was "required" to miss work for more than three days, a plaintiff employee must show that he or she was prevented from working *because of* the injury or illness based on a medical provider's assessment of the claimed condition. It does not mean that, in the employee's own judgment, he or she should not work, or even that it was uncomfortable or inconvenient for the employee to have to work. Rather, it means that a "health care provider" has determined that, in his or her professional medical judgment, the employee *cannot* work (or could not have worked) *because of* the illness. *Seidle*, 871 F.Supp. at 244.[11] If it were otherwise, a note from a spouse, parent, or even one's own claim that one cannot work be-

cause of illness would suffice. Given the legislative history surrounding its enactment, the FMLA cannot be understood to establish such liberal standards for its application.

Under applicable standards, therefore, Olsen can establish that he was required to be absent from work only if he produces evidence showing that a "health care provider" made a professional assessment of his condition and determined, based on that assessment, that an extended absence from work was necessary. Under the FMLA's interim regulations, a "health care provider" is given the following exclusive definition:

(1) A doctor of medicine or osteopathy who is authorized to practice medicine or surgery ... by the State in which the doctor practices; or

(2) Any other person determined by the Secretary to be capable of providing health care services.

(b) Others "capable of providing health care services" include only:

(1) Podiatrists, dentists, clinical psychologists, optometrists, and chiropractors (**limited to treatment consisting of manual manipulation of the spine to correct a subluxation as demonstrated by X-ray to exist**) authorized to practice in the State and performing within the scope of their practice as defined under State law....

29 C.F.R. § 825.118(a) (1993) (emphasis added). Thus, for a chiropractor to be considered a "health care provider," he or she must perform a "manual manipulation of the spine to correct a subluxation as demonstrated by X-ray to exist."

■ Olsen has presented no evidence that Dr. Schmidt performed a manual manipulation of Olsen's spine, and there is nothing in the medical records to suggest a "subluxation" had been revealed by way of X-ray either before or after Dr. Schmidt wrote a note excusing Olsen from work for extended periods of time. Indeed, it is undisputed

---

**10.** The actual duration of the child's fever was undisputed.

**11.** As *Brannon* discloses, this medical determination need not be made at any particular stage of the illness or at any particular point post-injury. As long as the medical provider's assessment of

medical history and of the patient's current condition supports the professional assessment given, and that assessment is that an absence in excess of three days is necessary to proper treatment, a plaintiff employee should withstand summary judgment *as to this particular* prong of his or her required showing.

that Dr. Schmidt did not take any X–rays until June 14, 1994, at least one day after he issued a written instruction that Olsen was to remain on light duty for the next four days. And, it is undisputed that the X–ray taken on June 14 revealed no abnormalities. Thus, the undisputed evidence demonstrates that Dr. Schmidt was not acting as a health care provider within the meaning of the FMLA when he purported to excuse Olsen from work.

█ Olsen attempts to avoid this conclusion by limiting the record available for the Court's consideration. Thus, Olsen argues that neither the defendant nor the Court can rely on the absence of a reference to "subluxation" in the medical records because those records have not been "authenticated." Olsen claims that, although the records were produced by him in this litigation (after some resistance), they may not be relied upon at this stage of the proceedings because they constitute "unauthenticated" hearsay. Olsen then claims that, in the absence of these records and in the absence of direct evidence that "subluxation" did *not* occur, summary judgment premised on the absence of that diagnosis is inappropriate. This argument turns the parties' respective burdens on their heads, however.

Ohio Edison seeks summary judgment on the ground that Olsen's condition did not constitute a "serious medical condition" within the meaning of the FMLA. Ohio Edison supports that motion with evidence indicating that the only health care professional to authorize an absence in excess of three days was a chiropractor who is only considered a "health care provider" under the FMLA in limited circumstances which plaintiff did not allege occurred here. In response, Olsen, who has the burden of proof under the FMLA, was required to proffer evidence indicating that Dr. Schmidt did act as a "health care provider" within the meaning of the FMLA. Amazingly, though seeking summary judgment himself, Olsen has not offered an affidavit from *any* doctor or medical professional indicating that the requisite findings of

"subluxation" or incapacity were made. In the face of this, Olsen seeks to prohibit reference to the medical records which provide an alternate source from which to glean those findings, or lack of the same. In response to a well-supported motion for summary judgment, Olsen cannot rely on the absence of a critical fact as to which he bears the burden of proof.

Because Olsen has not established that Dr. Schmidt was acting as a health care provider at the time he excused Olsen from work, the Court need not determine, for purposes of this motion, whether Dr. Schmidt's conclusion that Olsen should be excused from work was based on a meaningful professional assessment of Olsen's condition. *See Brannon,* 897 F.Supp. at 1037 (a physician's "speculation that it was reasonable for someone to miss three or four days for her type of illness was insufficient to establish that the absence was *necessary,"* even where physician is indisputably a "health care provider" under the FMLA) (emphasis added). The Court notes, however, that it is questionable whether Olsen could establish that Dr. Schmidt made the required assessment of Olsen's condition. The record reveals, for instance, that Dr. Schmidt apparently guaranteed Olsen he would provide Olsen a four (4) day work excuse *before* Dr. Schmidt even examined Olsen. Indeed, Olsen was confident enough of receiving a leave authorization from Dr. Schmidt that he called his supervisor, on the night before his first appointment with Dr. Schmidt, and was able to tell his supervisor then exactly how many days he would be missing from or limited while at work. Dr. Schmidt's records are also particularly unhelpful to Olsen on this point. They reveal, simply, Dr. Schmidt's conclusion that Olsen had suffered a strain *or* sprain (no distinction between the two is drawn) and that Olsen should refrain from all but light duty work because of that injury.[12]

Where, as here, an employee claiming the right to leave under the FMLA has not established that a qualifying [13] "health care

---

12. No where do the records disclose the nature of the treatment, if any, Olsen received from Dr. Schmidt.

13. The Court does not question that Dr. Schmidt is a *qualified* chiropractor. That fact, standing alone, is insufficient to render him a *qualifying* "health care provider" under governing FMLA regulations, however.

provider" made an assessment of his or her condition and concluded that proper treatment of that condition "required" the employee's absence from work for over three days, summary judgment in favor of the employer-defendant is appropriate.[14] Given Olsen's inability to clear this first hurdle with respect to this FMLA claim, the issue of whether Olsen received "continuing treatment" (the issue to which the parties devote most of their briefing) never arises.

## IV.

For all of these reasons, Olsen's Motion For Partial Summary Judgment is **DENIED** and Ohio Edison's Motion For Summary Judgment is **GRANTED**.

**IT IS SO ORDERED.**

---

**14.** Again, this assessment need not occur before *any* work is missed, and there is no obligation on the part of the employee to provide this assessment *to the employer in writing before a request* for leave is made. Here, the Court only addresses a plaintiff-employee's burden when responding to a motion for summary judgment in an action brought pursuant to the FMLA.