**Maurice BELL, Plaintiff,**

v.

**JEWEL FOOD STORE, Defendant.**

No. 98 C 6686.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 22, 2000.

Denise M. Mercherson, Chicago, IL, for plaintiff.

Henry W. Sledz, Jr., Christine Greener Uhlig Schiff, Hardin & Waite, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

Before the court is defendant Jewel Food Stores' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). For the following reasons the court grants the motion.

## I. BACKGROUND[1]

Plaintiff Maurice Bell ("Bell") is an African–American man who was employed by defendant Jewel Food Stores ("Jewel") from 1992 until March of 1998. Jewel owns and operates retail grocery stores in the Chicago area. Bell brought this suit against Jewel under (1) Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

---

1. Unless otherwise indicated, the following facts are taken from the parties' Local General Rule 12(M) and 12(N) Statements. Local General Rule 12 has been renumbered since the time the parties filed their briefs. The Local General Rule governing summary judgment motions is now LOCAL R. 56.1. Both the old and the new rule require the movant to file a statement of facts it claims is uncontroverted, see FORMER LOCAL GEN.R. 12(M); LOCAL R. 56.1(a)(3), and the non-movant to file a response to that statement, see FORMER LOCAL GEN.R. 12(N); LOCAL R. 56.1(b)(3). However, to be consistent with the parties' filings, the court will refer to the former Rule 12. See infra Sect. II.A (addressing the impact of Bell's improper denials in his Rule 12(N) Statement on the court's determination of the undisputed facts).

U.S.C. §§ 2000e *et seq.;* (2) the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.;* and (3) Illinois law prohibiting retaliatory discharge. Because Bell has voluntarily dismissed his Title VII race discrimination claim,[2] the court addresses only the two remaining claims. First, Bell alleges that Jewel violated the FMLA when it refused to grant Bell leave for his illness and instead terminated his employment. Second, Bell alleges that Jewel violated Illinois law when it retaliated against him for filing a workers' compensation claim by terminating his employment.

The matter is currently before the court on Jewel's motion for summary judgment. Jewel contends that it is entitled to judgment as a matter of law on Bell's FMLA claim because (1) Bell has failed to establish that he requested leave under the FMLA, and (2) Bell has failed to establish that he suffers from a "serious health condition" as required to qualify for leave under the FMLA. Jewel also contends that it is entitled to judgment as a matter of law on his retaliatory discharge claim because (1) Bell has failed to establish the prima facie element of causation as required to state a claim for retaliatory discharge, and (2) Bell has failed to show that Jewel's reason for discharge was pretextual.

Bell worked as an assembler—responsible for moving products within a warehouse—in three different locations owned by Jewel. Bell began working at a warehouse in Hillside, Illinois, then transferred to the "Fresh Foods Center" in Melrose Park, Illinois. Finally, Bell was transferred to the "Dry Grocery Building" in Melrose Park, where he remained until his termination in March of 1998. During Bell's employment at the Dry Grocery Building, Dan Frasco ("Frasco") served as Distribution Manager and Joe Herrmann ("Herrmann") served as Plant Superintendent. At all times during his employment, Bell was a member of the Chicago Truck Drivers Union and was covered by the collective bargaining agreement executed by the union and Jewel.

In order to understand this court's opinion, one must be aware of a number of facts. For the sake of clarity, a recitation of these facts is in four parts. Part A discusses the relevant policies and procedures in place at Jewel. Part B discusses Bell's employment history at Jewel. Part C discusses events which relate to Bell's FMLA and retaliatory discharge claims. Part D discusses Bell's medical treatment.

## A. *Jewel's policies and procedures*

Part of the collective bargaining agreement—entered into between Jewel and the union of which Bell is a member—is an attendance policy which governs employee absences. This policy is based upon a point system. Under the policy, if an employee is going to be absent, he is required to call work and notify the supervisors of the reason for his absence. Points accumulate for various violations of this policy. As the points accumulate, Jewel must follow certain procedures and protocol for disciplining the employees, which include sending a written warning prior to termination. Bell admits that he was aware of these call-in procedures.

Between June 26, 1996 and January 26, 1998, Bell received several points under the attendance policy, resulting in five separate written warnings. Moreover, in October of 1998, Bell accumulated forty-five points, which is enough to warrant indefinite suspension or termination. However, because Bell had accumulated the points so quickly, Jewel was not able to follow the correct protocol for terminating an employee.

In addition to the point-based attendance policy, the collective bargaining agreement contains a rule referred to by the parties as the "four day no call/no show" rule. Under the four day no call/no show rule, "[a]n employee shall be considered as quitting ... (d) who is absent from

---

**2.** *See* Parties' Joint Pretrial Order, Ex. H, filed Aug. 8, 1999.

work without approval for four (4) consecutive calendar days in a scheduled workweek." (Def.Mot. for Summ.J., Ex. 10.) Bell admits that he was familiar with this policy as well. In fact, Bell was terminated—and ultimately reinstated—in 1995 for violating this rule.

Related to the four day no call/no show rule, Jewel is in the practice of treating an employee as "sick" for four days. In other words, when an employee calls in sick, Jewel considers that person sick for that day and the next three consecutive work days (relieving the employee of the obligation to call in every day he is sick). However, after four days, the employee must either return to work or call in to report that he is still sick. If the employee fails to call in and is absent for four consecutive days, then that employee is subject to termination.

## B. *Bell's Employment History*

In 1995, Bell suffered from ulcers and was absent from work for four consecutive days. Because Jewel had no record of Bell calling in to say he would be absent, it terminated Bell's employment. In a letter dated June 5, 1998, Jewel explained to Bell that it considered Bell as quitting because he was absent for four consecutive days without calling in to notify his supervisors of the reason for his absence. Bell was also contacted by union representative Lloyd Caldwell ("Caldwell") to explain that he had been fired for violating the four day no call/no show rule. During this time, Bell met with his supervisor and Caldwell, who both explained the four day no call/no show rule to Bell. Bell claimed that he had, in fact, phoned in to report that he would be absent. Bell backed up that claim with his phone records which showed that he had called in on the day in question. After proving that he had called, Bell was reinstated.

Bell was also absent from work for two weeks in March of 1997 for an injury sustained while at work. As a result of this injury, Bell filed a workers' compensation claim in June of 1997. This claim ultimately settled for approximately $4,700.00, including attorneys' fees, in 1998. Neither Frasco and Herrmann claim to have any knowledge of Bell's workers' compensation claim. (Def.Rule 12(M) Statement ¶ 23 (citing Exs. 11, 12).) Although Bell claims that the managers knew about his claim, he does not offer any basis for this belief. (Def.Mot. for Summ.J., Ex. 3 at 194:5–17.) Furthermore, Bell even admits that he had no conversations with Herrmann, or any other supervisor, regarding his workers' compensation claim. (*Id.* at 192:2–6.)

## C. *Events leading up to Bell's claims*

On February 24, 1998, Bell called Jewel and spoke to Judy Kittredge ("Kittredge"), who is responsible for documenting employee absences. Kittredge records the information regarding employee absences, which she receives from the employees, and forwards the information on to the supervisors, including Herrmann. When Bell called on February 24, 1998, he told Kittredge that he was sick and not feeling well. He further said that he was "going to take [his] three days" and that he would come in if he was feeling better. (*Id.* at 96:15–18.) Bell claims that he was suffering from pain to his lower back at that time. However, when he called in on February 24, 1998, Bell did not explain his illness to Kittredge.

According to Jewel's practice, Bell had until March 2, 1998 to either return to work or to call in to report that he was still sick. Bell did not return to work on March 2, 1998. Instead, Bell again called to say that he was sick and would not be returning to work. This time Bell spoke to Matt Barkmeier ("Barkmeier"). Bell told Barkmeier that he was "still a sick man" and that he was hurting and would not be in to work. Again, Bell did not explain his illness or pain to Barkmeier. Bell did tell Barkmeier that he was "going to be under [his] doctor's care," meaning that he "was going to get back with them." (*Id.* at

102:2–7.) When he·called in on March 2, 1998, Bell was not under a doctor's care, nor had he seen a doctor at that point.

Now, according to Jewel's practice, Bell had until March 8, 1998 to either return to work or to call in to report that he was still sick. Bell did not return to work, but was absent from work for five consecutive days during the week of March 8, 1998. Bell did not call Jewel, or any agent of Jewel, after March 2, 1998 to report that he was sick and unable to work. Kittredge recorded that Bell was absent without notice on March 8, 9, 10, 11, and 12, 1998 and notified Herrmann of Bell's absences. On March 17, 1998 Herrmann prepared a letter addressed to Bell which stated: "During the period of Saturday, March 8, 1998 through Monday, March 16, 1998, we have no record of your calling to inform us of the reason for your absence. We are, therefore, accepting your resignation ... effective *Tuesday, March 17, 1998*." (*Id.,* Ex. 3, Sub-ex. 11 (emphasis in original).)

On April 14, 1998, Bell had a meeting with Herrmann and two union representatives to discuss Bell's termination letter. At that meeting, Bell submitted phone records which showed that he had called Jewel on February 24, 1998 and March 2, 1998.[3] Plaintiff also presented records showing that he had seen a doctor on March 4, 1998 and March 6, 1998. Following that meeting, Herrmann determined that Bell had failed to establish that he called in to notify Jewel of the reason for his absences during the week of March 8, 1998. Herrmann found that, while the telephone calls on February 24 and March 2, 1998 were acceptable to excuse Bell's absences from February 24 through March 6, 1998, Bell did not provide acceptable notice for absences extending through mid-March.

Bell also filed a union grievance regarding his termination. Following a hearing by a Joint Grievance Committee, Bell's grievance was denied.

### D. *Bell's medical treatment*

On March 4, 1998, Bell—suffering from pain in the lower, right-side of his back—sought medical treatment at Cook County Hospital where he was treated by Dr. Frank H. Parker, Jr. ("Dr.Parker"). (*Id.,* Ex. 5.) Dr. Parker ran several tests and determined that Bell was suffering from a urinary infection which could cause lower back pain. (*Id.*) To treat this infection, Bell was given a one-time dosage of medication: "Well, we treated him with medication that same day ... It's just a one-time dose." (*Id.* at 16:15–16, 17:2.) Bell was instructed to return to Cook County Hospital on March 6, 1998 for the results of further blood tests. However, on March 6th, the results were not ready and Bell was instructed to call for the results at a later date. (*Id.* at 24:14–19.) In his deposition testimony, Bell admits that he did not follow-up with Cook County Hospital. Further, Dr. Parker stated that he records any notes related to work restrictions on a county back-to-work statement. (*Id.* at 22:1–14.) There was no such statement in Bell's records.·

· Bell also sought medical treatment for his back pain from Dr. Ramesh Kharwadkar ("Dr.Kharwadkar"). Bell claims that he saw Dr. Kharwadkar on March 3, 1998 and, in a letter from Dr. Kharwadkar to Jewel, Dr. Kharwadkar claims that Bell had been under his care since March 3, 1998. Although Bell claims he sought treatment on March 3, 1998, he also says that Dr. Kharwadkar did not recommend any treatment at that time. (*Id.,* Ex. 3 at 120:20–22.) However, Dr. Kharwadkar's own records and Bell's patient file do not support the assertion that Bell was under Dr. Kharwadkar's care since March 3, 1998. In fact, according to the medical records and Dr. Kharwadkar's deposition

---

**3.** The court takes notice that, although the parties do not affirmatively state as much, the phone records show that Bell called in on those two dates alone: there is no record of Bell·calling in on any date after March 2, 1998.

testimony, Bell did not see Dr. Kharwadkar until March 24, 1998. (*Id.*, Ex. 4 at 10:12–19.) Bell did not receive a disability certificate from Dr. Kharwadkar. Further, in his letter, Dr. Kharwadkar does not state that Bell was unable to work, only that Bell had been under his care.

## II. *DISCUSSION*

### A. *Local General Rule 12*

■ Before addressing the merits of this summary judgment motion, the court must address whether Bell admits certain facts contained in Jewel's Rule 12(M) Statement. In his Rule 12(N) Statement, Bell denies certain paragraphs contained in Jewel's Rule 12(M) Statement. (*See* Pl.Rule 12(N) Statement, ¶¶ 23, 33, 36.) Under Local Rule 12(N), when a party disagrees with a portion of the movant's statement, he must provide specific references to the record which were relied on in that particular response. In his Rule 12(N) Statement, Bell cites to portions of his own deposition testimony which are supposed to contradict the claims made in Jewel's Rule 12(M) Statement. (*Id.*) However, those portions of the record cited by Bell to do *not* support his denials. On the contrary, the record supports those facts contained in Paragraphs 23, 33 and 36 of Jewel's Rule 12(M) Statement. (Def.Mot. for Summ.J., Ex. 3 at 192:2–6; Ex. 5 at 22:1–14; Ex. 13.) Bell has failed to reference any part of the record which would disagree with these paragraphs. Thus, to the extent that these facts are supported by the record, they are deemed true. *See Stewart v. McGinnis*, 5 F.3d 1031, 1033–34 (7th Cir.1993) (holding that facts alleged in a Rule 12(M) Statement are deemed admitted if they are supported by the record).

4. On August 31, 1999, both parties waived a jury trial on the record and in open court. Thus, in deciding this motion for summary judgment, the court will look at the record in

### B. *Standard for Deciding Summary Judgment Motion*

A motion for summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant.[4] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995).

The burden is on the moving party to show that no genuine issues of material fact exist. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Once the moving party presents a prima facie showing that he is entitled to judgment as a matter of law, the non-moving party may not rest upon the mere allegations or denials in its pleadings, but must set forth specific facts showing that a genuine issue for trial exists. *Id.* at 256–57, 106 S.Ct. 2505; *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir.1989).

### C. *Family Medical Leave Act*

Bell claims that Jewel violated his rights under the FMLA by denying him leave. Specifically, Bell claims that he gave notice of the need for leave on March 2, 1998 but was denied, resulting in his termination on March 17, 1998. Jewel contends (1) Bell did not request leave under the FMLA, and (2) Bell did not suffer from a serious health condition and, thus, he was not cov-

a light most favorable to Bell and determine whether it could reasonably enter judgment for Jewel.

ered by the FMLA. The court agrees with Jewel.

█ The FMLA provides that an employee may take up to twelve weeks unpaid leave for a serious illness suffered by the employee or a family member. 29 U.S.C. § 2612(a)(1)(D). Because the FMLA creates substantive rights for an employee, the employee bears the burden of proving that he was entitled to FMLA leave and the employer violated the statute by denying him such leave. *Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 713 (7th Cir.1997) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). Thus, the court must determine whether "the plaintiff has established by a preponderance of the evidence, that he is entitled to the benefit he claims." *Id.* (reaffirming *Price v. Ft. Wayne*, 117 F.3d 1022 (7th Cir. 1997)).

### 1. *Notice of request for leave under the FMLA*

█ An employee seeking leave under the FMLA need not specifically invoke his rights under the FMLA. *Price*, 117 F.3d at 1026. To sufficiently request leave under the FMLA, an employee need only provide the employer "with enough information to put the employer on notice that FMLA-qualifying leave is needed." *Stoops v. One Call Communications, Inc.*, 141 F.3d 309, 312 (7th Cir.1998); *see also Price* 117 F.3d at 1025. In other words, the employee's request for time-off must at least alert the employer that he suffers from a "serious health condition." *Stoops*, 141 F.3d at 312; *see also* 29 C.F.R. § 825.208(a)(2). This

then shifts the burden on to the employer to inquire further. *Id.*

Bell claims that when he called Jewel on March 2, 1998 to inform his supervisors that he was still sick, he was—in effect—requesting leave under the FMLA. On that day, Bell did not need to specifically request leave under the FMLA. However, he *did need to* put Jewel on notice that this was a possible FMLA situation—meaning he had to give some indication that he was suffering from a "serious health condition" and qualified for leave under the FMLA. During his March 2, 1998 phone call to Jewel, Bell did not tell Barkmeier what was wrong with him or describe how he was sick, he simply told Barkmeier that he was sick and hurting. Further, while Bell did tell Barkmeier that he was *going to* see his doctor, Bell did not say that he was receiving medical treatment at that time. (Def.Mot. for Summ.J., Ex. 3 at 102:1–22.)

The court seriously doubts that this March 2, 1998 conversation was enough to put Jewel on notice that Bell may be in a FMLA-qualifying situation. Nevertheless, the employer does bear some burden in investigating the employee's claim and determining whether he does, in fact, qualify for leave under the FMLA. 29 C.F.R. § 825.303(b); *see also Stoops*, 141 F.3d at 312. Jewel has not presented any evidence that it investigated Bell's request for time-off or checked into the seriousness of Bell's condition. However, because the court determines that Bell did not qualify for leave under the FMLA, *see infra* Sec. II.C.2., whether he provided notice requesting such leave is irrelevant.[5]

---

5. In his brief, Bell also asserts—for the first time—that Jewel violated the FMLA because it did not provide notice to its employees regarding their FMLA rights and obligations—pursuant to 29 C.F.R. § 825.301(a)(1)—in the employee handbook which Bell received when he began working for Jewel in 1992. (Pl.Br. in Opp'n to Def. Mot. for Summ.J. at 8.) The court rejects this argument because (1) section 825.301(a)(1) of the Code of Federal Regulations did not take

effect until April 6, 1995, 60 FED.REG. 6658, while the handbook referred to by Bell was published on or before 1992; (2) while section 825.301(f) of the Code of Federal Regulations states that failure to provide such notice precludes an employer from taking action against an employee for failure to comply with FMLA obligations, Bell was not qualified for leave under the FMLA, *see infra* Sec. II. C.2, so any action taken against him for his absences are beyond the scope of the FMLA

### 2. *A qualifying serious health condition*

■ To qualify for leave under the FMLA, Bell must establish that he had a "serious health condition." The FMLA defines a "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11); *see also Price,* 117 F.3d at 1023. Further, the Code of Federal Regulations defines a "serious health condition" as: "[a] period of incapacity ... of more than three consecutive days, and any subsequent treatment that also involves: (A) Treatment two or more times by a health care provider ... or (B) Treatment by a health care provider on at least one occasion which results in a regime of continuing treatment under the supervision of the health care provider." 29 C.F.R. § 825.114. Whether an employee suffers from a "serious health condition" is a question of law. *Haefling v. United Parcel Serv., Inc.,* 169 F.3d 494, 499 (7th Cir.1999) (finding that "an employee may not sidestep [the issue] in the context of summary judgment merely by alleging his condition to be [a 'serious health condition']").

■ Bell did not receive in-patient care. Thus, the court must determine whether evidence exists to show that Bell suffered from a period of incapacity and received continuing treatment by a health care provider. *Haefling,* 169 F.3d at 499. "Incapacity" means more than an inability to work: Bell must show that the illness or impairment resulted in his inability to perform routine daily activities on those days he was absent or unable to work. *Id.* (finding that the plaintiff was not incapacitated because he testified that he was able to care for himself, to eat and drink, to engage in marital relations, and to learn).

Further, Bell must show that he saw a doctor at least twice for the same illness or injury, or that he saw a doctor once but that doctor prescribed an on-going treatment plan.

■ Bell does not address the issue of whether he suffered from a serious health condition. In fact, Bell does not directly address the issue of his eligibility under the FMLA. Bell does claim that he sought the care of a health care provider twice: once when he saw Dr. Kharwadkar on March 3, 1998 and again when he went to Cook County Hospital and was treated by Dr. Parker. However, the court finds that neither of these medical visits qualify as "continuing medical treatment" as required under the statute or as defined by the Code of Federal Regulations.

First, Bell saw Dr. Kharwadkar for the first time over a week after Bell had been terminated. Although Bell claims that he saw Dr. Kharwadkar on March 3, 1998— and a letter from Dr. Kharwadkar states that Bell had been under his care since March 3, 1998—the medical records do not support this date. On the contrary, the medical records indicate that Bell did not see Dr. Kharwadkar until March 24, 1998. Further, in his deposition, Dr. Kharwadkar admits that he did not see Bell until March 24, 1998:

Q. But your offices [*sic*] notes show that Mr. Bell had not had his first office visit with you for his back condition until March 24th, '98, is that correct?

A. That is right.

Q. So the date 3–3–98 is incorrect in this note?

A. Well, sometimes what happens— and I'm unable to recall at this time but sometimes patients will continue to complain of complaints and we give them medication and, you know, the approximate date we write.

and the corresponding sections of the Code of Federal Regulations; and (3) even if the regulations did apply, the lack of notice in the handbook had no effect on Bell's alleged at-

tempt to request leave under the FMLA, *see Sarno v. Douglas Elliman–Gibbons & Ives, Inc.,* 183 F.3d 155 (2nd Cir.1999).

Q. You write down sometimes the approximate date of when you started—

A. Yeah. For example, if he comes today and he told me that he was having pain since about a week or so, then I will write.

(Def.Mot. for Summ.J., Ex. 4 at 21:6–22.) Thus, based upon the record, Bell was not under the care of Dr. Kharwadkar during his employment with Jewel. To qualify for leave under the FMLA on March 2, 1998— when Bell claims he requested it—he had to have been receiving continuing medical treatment. *See* 29 U.S.C. § 2611(11); 29 C.F.R. § 825.114. Thus, Bell's visit to a doctor nearly one week after his termination does not satisfy the statutory requirement of "continuing treatment."

Second, Bell sought treatment at Cook County Hospital on March 4, 1998 and was examined and treated by Dr. Frank H. Parker, Jr. ("Dr.Parker"). Following that examination, Dr. Parker concluded that Bell had a urinary infection and treated him with a one-time dosage of medication on March 4, 1998. (Def.Mot. for Summ.J., Ex. 5 at 16:15–1, 17:2.) At this time, Bell was instructed to come back to Cook County Hospital on March 6, 1998 in order to get the results of further blood tests. However the results were not ready on that date and Bell failed to follow-up. This is not enough to establish that Bell was under the continuing care of a health care provider: Bell saw Dr. Parker only once for an examination and the only treatment Bell was given was a one-time dosage of medication. *See* 29 C.F.R. § 825.114[B].

Third, Bell claims that he requested leave under the FMLA on March 2, 1998. To even qualify for leave at that time, Bell must have been suffering from a "serious health condition" on March 2, 1998. On the contrary, Bell had not seen a doctor, was not receiving any medical treatment, and was not under doctor's orders to remain off of work when he called Jewel on March 2, 1998. Thus, the timing and substance of the treatments Bell received

from Dr. Parker and Dr. Kharwadkar are not enough to qualify Bell as suffering from a serious health condition as defined under the FMLA.

Finally, Bell cannot establish that he was "incapacitated" as prescribed under the FMLA's definition of "serious health condition" on March 2, 1998 when Bell called in and from March 8 – March 17, 1998 when Bell was absent from work. While he claims that he was unable to do anything, Bell's own statement is not enough to establish he was incapacitated: Bell must provide evidence from a medical professional or health care provider that he was unable to work. *Joslin v. Rockwell Intern. Corp.*, 8 F.Supp.2d 1158, 1160 (N.D.Iowa 1998) (finding that an employee's own testimony that she was unable to work because of her illness was insufficient to prove that she was incapacitated); *see also Austin v. Haaker*, 76 F.Supp.2d 1213, 1221 (D.Kan.1999); *Olsen v. Ohio Edison Co.*, 979 F.Supp. 1159, 1166 (N.D.Ohio 1997) (holding that a health care provider must determine that an employee required an extended medical leave). In this case, there is no evidence that Dr. Parker placed any restrictions on Bell. In fact, Dr. Parker testified that any work-restrictive orders are made on a back-to-work form provided by Cook County Hospital: no such order was found in Bell's medical records. (Def.Mot. for Summ.J., Ex. 3 at 22:1–14.) Thus, it does not appear from the record that Dr. Parker posed any restriction on Bell's ability to work. Also, Dr. Kharwadkar could not determine if Bell was incapacitated from March 2, 1998 through March 17, 1998 because he did not examine Bell until March 24, 1998. Moreover, even after Dr. Kharwadkar examined Bell on March 24, 1998, there is no evidence that he determined that Bell was incapacitated. (*See* Pl.Resp. to Def.Mot. for Summ.J., Ex. 2, Sub-ex. 8.) Thus, Bell has not adduced evidence which shows that he was "incapacitated" at the time of his termination, or during the time he claims

he was unable to work, so as to qualify for leave under the FMLA.

In sum, Bell has not shown that he suffered from a "serious health condition" because he has failed to adduce evidence which shows he was under the continuing care of a health care provider or that he was receiving continuing medical treatment. Further, Bell has also failed to adduce evidence that establishes that he was incapacitated on those dates he claims that he was unable to work. Thus, Bell did not qualify for leave under the FMLA. Accordingly, the court grants Jewel's motion for summary judgment on Bell's FMLA claim.

### D. *Retaliatory Discharge Claim*

In March of 1997, Bell was injured while at work and was absent from work for nearly two weeks. As a result of this injury, Bell filed a workers' compensation claim on June 5, 1997. Bell now claims that his termination on March 17, 1998 was in retaliation for filing this claim. Jewel argues that Bell's discharge was not causally related to Bell's workers' compensation claim because (1) Bell's supervisors—who made the decision to terminate his employment—were unaware that Bell had filed a workers' compensation claim, and (2) Jewel had a legitimate reason for terminating Bell, namely that he violated the four day no call/no show rule. The court agrees with Jewel.

Illinois law recognizes the tort of retaliatory discharge in cases in which an employee is terminated for filing a workers' compensation claim.[6] *Jackson v. Bunge Corp.*, 40 F.3d 239, 242 (7th Cir. 1994) (citing *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 23 Ill.Dec. 559, 384 N.E.2d 353, 358 (1978)). This law applies to union workers as well. *Id.* To establish a claim for retaliatory discharge, an employee must prove that (1) he was an employee before the injury; (2) he exercised his

rights under the Workers' Compensation Act; and (3) his discharge was causally related to the filing of a claim under the Act. *Id.* If an employee can establish this prima facie case, the employer can then overcome it by showing that "the employer has a valid basis for discharge which is not merely pretextual." *Id.* In other words, if an employer can establish a legitimate, nondiscriminatory reason for the discharge, then the burden shifts to the employee to prove that the proffered reason was a pretext. *McEwen v. Delta Air Lines, Inc.*, 919 F.2d 58, 59 (7th Cir.1990) (adopting the burden-shifting method used in Title VII cases for claims brought under Illinois law for retaliatory discharge based on a workers' compensation claim).

In this case, Bell was an employee when he was injured in 1997 and he did file a workers' compensation claim pursuant to the Workers' Compensation Act. Thus, he has satisfied the first two elements of a prima facie case of retaliatory discharge. The court's focus, therefore, is on whether Bell has adduced evidence sufficient to show a causal connection between his termination and his filing a workers' compensation claim.

Bell claims, and bears the burden of establishing, that his termination on March 17, 1998 was causally related to his workers' compensation claim. Bell argues that the management—specifically Herrmann—knew about his workers' compensation claim simply because they were management. This is not enough to establish a causal relationship between his workers' compensation claim and his termination. Herrmann, who made the decision to terminate Bell's employment, claims that he knew nothing about Bell's workers' compensation claim. Bell has offered no evidence, nor has he pointed to anything in the record, that shows that Herrmann or any other supervisor knew

---

6. In the Final Pretrial Order filed on August 8, 1999, the parties jointly state that this action alleges a retaliatory discharge claim "for filing a workers compensation claim, asserted pursuant to Illinois law." (Final Pretrial Order, ¶ 1.)

that Bell had filed a workers' compensation claim. In fact, Bell stated in his deposition that he had not talked to anyone in management about his claim: "Q: Did you have any discussions with any management people at Jewel or supervisors at Jewel about your worker's comp claim? A: No, no. No, I wouldn't talk to anyone about that." (Def.Mot. for Summ. J., Ex. 3 at 192:2–6.) While Bell does reference portions of his deposition where he testifies to conversations with various supervisors about his injury, (Pl.R.12(N) Statement, ¶ 23), conversations about an injury are not the same as conversations about an actual workers' compensation claim that has been filed. Thus, the court finds that Bell's cited testimony is not enough to establish a causal connection between his filing a workers' compensation claim and his discharge nearly a year later.

However, even if the court were to assume that the management was all knowing and aware of Bell's workers' compensation claim, Bell has not offered any evidence to rebut Jewel's legitimate reason for terminating his employment. Jewel contends that it terminated Bell's employment because Bell was absent from work for five consecutive days without calling in, violating the four day no call/no show rule. This is a legitimate, nondiscriminatory reason for termination. *See McEwen*, 919 F.2d at 60 (holding that excessive absenteeism—even if it is caused by a compensable injury—is a grounds for termination). Jewel further argues that it has complied with its four day no call/no show rule in the past, including terminating Bell in 1995—two years before he filed a workers' compensation claim—for an alleged violation of the same rule.[7]

Bell was absent without notice from March 8, 1998 until his termination on March 17, 1998. Thus, Bell violated Jewel's four day no call/no show rule. Following his termination on March 17, 1998, Bell offered no evidence to his supervisors, or to Herrmann specifically, that he did call in after March 2, 1998 to notify Jewel of his absence. More importantly, in his current motion, Bell offers no evidence to show that Jewel's legitimate reason for terminating his employment—that being Bell's violation of the four day no call/no show rule—was pretextual.

In sum, because Bell failed to adduce any evidence to establish that the decision to terminate his employment was causally related to the filing of his workers' compensation claim, Bell cannot make a prima facie showing of retaliatory discharge. Further, even if this court were to determine that such a showing could be made, Bell has failed to adduce any evidence which would negate Jewel's legitimate, nondiscriminatory reason for Bell's termination. Therefore, Bell has failed to raise a genuine issue of material fact with respect to his retaliatory discharge claim. Accordingly, Jewel's motion for summary judgment with respect to Bell's claim of retaliatory discharge is granted.

### CONCLUSION

For the foregoing reasons, the court grants Jewel's motion for summary judgment on plaintiff Maurice Bell's claims for (1) violation of the FMLA and (2) retaliatory discharge insofar as that claim is based upon Bell's filing of a worker's compensation claim. Final judgment in this case is entered in favor of defendant Jewel Food Stores and against plaintiff Maurice Bell.

---

7. In 1995, Bell was reinstated only when he presented his phone records which indicated that he had, in fact, called in to notify Jewel of his absence. Following his termination on March 17, 1998, Bell again presented phone records establishing that he had called in on two occasions. However, those records did not show that Bell had called in after March 2, 1998, even though Bell was absent from work—without proper notification to his supervisors—from March 8, 1998 until his termination on March 17, 1998.