Flanagan v. Keller Products        CV-00-542-M    02/25/02
                UNITED STATES DISTRICT COURT

                  DISTRICT OF NEW HAMPSHIRE


Yvette Flanagan,
      Plaintiff

      v.                                Civil No. 00-542-M
                                        Opinion No. 2002 DNH 047
Keller Products, Inc.,
      Defendant


                        **O R D E R**


      Yvette Flanagan brings this action against her former

employer, Keller Products, Inc. ("KPI"), seeking damages for

alleged violations of the Family Medical Leave Act, 29 U.S.C.

§ 2601, et seq. ("FMLA"), and Title VII of the Civil Rights Act

of 1964, 42 U.S.C. § 2000e, et seq.  Invoking the court's

supplemental jurisdiction, see 28 U.S.C. § 1367, she also brings

a state law claim in which she says KPI violated New Hampshire's

Law Against Discrimination, N.H. Rev. Stat. Ann. ("RSA") 354-A.[1]

_____

      [1]    By order dated October 17, 2001, the court granted
KPI's motion for judgment on the pleadings as to Flanagan's
negligent infliction of emotional distress claim (count 4).  It
also held that count 5 of her complaint (enhanced compensatory
damages) does not state of cause of action but, instead, seeks a
remedy that may or may not be available, depending upon the
evidence presented.

Flanagan moves for summary judgment as to her FMLA claim. KPI objects and, in turn, moves for summary judgment as to all of Flanagan's remaining claims.

## Standard of Review

When ruling on a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Intern'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Center, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

## Background

I.  <u>Flanagan's Attendance Issues</u>.

KPI manufactures various products made of molded wood and plastic, such as table bases and furniture consoles.  In February of 1998, it hired Flanagan as an office clerk and customer service representative.  Her established work hours were from 8:00 a.m. to 12:00 p.m. and 1:00 p.m. to 5:00 p.m., Monday through Friday.  According to KPI, its office is closed to customers and no incoming customer calls are accepted after 5:00 p.m.  Consequently, says KPI, it was important that Flanagan work during her established hours, rather than early in the morning or in the evening, after 5:00 p.m.

Marcia Trombly, KPI's office manager, was Flanagan's immediate supervisor.  <u>See</u> Affidavit of Richard Steinberg at para. 4, Exhibit B to defendant's memorandum (document no. 22).  According to Trombly, Flanagan was, generally speaking, a good worker with no significant performance-related problems.  From the start of her employment at KPI, however, Flanagan had attendance problems.

3

> Despite performing her work well, Ms. Flanagan had very
> poor attendance, including tardiness, absences, leaving
> work early, and leaving to attend to personal matters
> during the day. These problems persisted from the
> beginning of her employment. On January 19, 1999, she
> was given [her first, annual] performance review which
> expressly noted that her attendance needed to improve.
> . . . As a result of her attendance issues, I was
> unable to give her a raise at the time of her review.
> I also orally counseled Ms. Flanagan on numerous issues
> regarding the need to improve her attendance.

Affidavit of Marcia Trombly at para. 5, Exhibit A to defendant's memorandum. The written performance evaluation provided to (and signed by) Flanagan corroborates Trombly's testimony and provides, "Attendance must be improved. A report from payroll shows numerous weeks under 40 hours, many 40 hour weeks are due to being allowed to make up lost time at lunch or at 7:30 AM." Exhibit A-1 to defendant's memorandum.

Flanagan's time records reveal that her attendance did not improve in the wake of her performance review. "During this period [i.e., January 19, 1999 through June 25, 1999 - the date of Flanagan's termination], Ms. Flanagan missed time on at least thirty two (32) occasions. While Ms. Flanagan may have made up some missed time by working additional hours on other days, those additional hours were worked outside the Company's preferred and

4

posted office hours." Affidavit of Marcia Trombly at para. 5.

See also Flanagan's weekly time records, Exhibit A-2 to

defendant's memorandum.

In May of 1999, notwithstanding continued attendance

problems, Flanagan was promoted. Trombly testified that,

> Although she continued to have attendance problems, I
> had numerous conversations with Ms. Flanagan where she
> assured me she could and would improve her attendance.
> I also felt that the increase in pay and additional
> responsibility might have the effect of helping her
> become more responsible. Additionally, Ms. Flanagan
> was a good worker who accomplished her assigned tasks,
> and if she could straighten out her absenteeism issues,
> she would have been a good [employee]. As such, I took
> a chance on promoting her. Unfortunately, her
> attendance related issues persisted after her
> promotion.

Id., at para. 11. In fact, Flanagan was absent the very day on

which she was promoted. Id., at para. 12.

It appears that on May 18, 1999, Flanagan chipped a tooth

while eating at work. Eventually, the tooth became abscessed,

prompting her oral surgeon to extract it. Flanagan subsequently

developed a condition known as "dry socket." On Friday, June 18,

1999, Flanagan says she informed Trombly that she was going to

5

try to make an appointment with her dentist and that her daughter was not feeling well at school, so she might have to leave early either to see her dentist or to pick up her daughter. See Affidavit of Yvette Flanagan at para. 12, Exhibit 1 to plaintiff's memorandum (document no. 21). While Trombly was at lunch, Flanagan was able to obtain an appointment with her dentist and says she told a co-worker to inform Trombly that she was leaving to attend that appointment. As she was walking out, however, Flanagan ran into Trombly. Nevertheless, she failed to mention the dental appointment; instead, she said only that she "needed to leave and go pick up [her] daughter and that [she] would try to make other childcare arrangements and return that afternoon." Id., at para. 17. After seeing her dentist, Flanagan returned to work and spoke with Trombly, who learned for the first time that Flanagan had been at the dentist and was experiencing pain. Trombly told Flanagan that she should go home for the day. Id., at para. 23.

The following Monday, Trombly says Flanagan informed her that she had spent the entire weekend in Loudon, New Hampshire, at the annual Motorcycle Weekend and showed Trombly a burn she

6

received on her leg from riding that weekend (as discussed more fully below, Flanagan's having attended Motorcycle Weekend suggests that she was not "incapacitated" by virtue of her dental condition over the weekend). On Tuesday, Flanagan left work early to attend another appointment with her dentist, but she did not disclose the nature of her dental condition to anyone at KPI. See Flanagan Affidavit at para. 24; Trombly Affidavit at para. 15. That Friday, Flanagan says she suffered adverse side effects from pain medication and "determined that it was unlikely that [she] would be able to work that day." Flanagan Affidavit at para. 26. She says she contacted KPI and spoke with one of its supervisory personnel, to whom she "explained the situation." Id., at para. 27. That statement is obviously somewhat vague with regard to exactly what Flanagan told KPI about the nature of her illness and the reason for her absence. Importantly, however, Flanagan does not dispute Trombly's assertion that "Ms. Flanagan did not provide any reason for this absence other than stating that she was sick." Trombly Affidavit at para. 15. Trombly says, at that point, she had:

> become frustrated with Ms. Flanagan's inability to
> attend work during the normal work hours and her
> repeated absences, tardiness, leaving work early,

7

working during non-traditional work hours, and her lack of candor the previous Friday. I made the decision to terminate her based on these issues.

Trombly Affidavit at para. 15.


II. <u>Workplace Harassment</u>.

Unlike the facts relevant to Flanagan's FMLA claim, as to which there appear to be no genuine disputes, those underlying her Title VII claim are very much disputed by the parties. Accordingly, for purposes of ruling on KPI's motion for summary judgment, the court will accept Flanagan's version (to the extent it is properly supported in the record).


During Flanagan's tenure at KPI, Ray Stevens was the Director of Marketing Operations. Flanagan's job required her to interact with Stevens at least twice each day: once in the morning and again in the afternoon. During the course of her employment, Flanagan says Stevens subjected her to a near-constant stream of sexual harassment. Incidents recounted by Flanagan include:

1. Comments by Stevens concerning Flanagan's physical appearance;

8

2.    Repeated invitations to lunch, which Flanagan
      declined whenever it appeared that they were
      not directly related to work issues;

3.    Repeated unannounced visits by Stevens to
      Flanagan's home, during which he would sit in
      the driveway if Flanagan refused to answer
      the door;

4.    Numerous romantic letters and gifts from
      Stevens to Flanagan;

5.    Stevens discussing with Flanagan very
      personal aspects of his sex life;

6.    Harassing telephone calls by Stevens to
      Flanagan on nearly a daily basis; and

7.    On one occasion, without invitation from
      Flanagan, Stevens let himself into her home
      and she awoke in the morning to find him
      sitting on her bed.

See generally Complaint (document no. 1); Exhibit 2 to

Plaintiff's memorandum (document no. 35), Affidavit of Yvette

Flanagan.[2]

---

[2]    Perhaps not surprisingly, Stevens (since deceased)
painted a very different picture of his relationship with
Flanagan - one in which she initiated contact, was solicitous of
his attention, eventually gave him a key to her home and told him
to "come by anytime" in the morning, and drew him into a
(Platonic) relationship that she ultimately used as a means by
which to extract gifts and fairly substantial sums of money from
him. See generally Ray Stevens' letter of resignation, Exhibit
B-2 to defendant's memorandum (document no. 22).

**Discussion**

I.  Title VII - Hostile Work Environment.

Flanagan says all of Stevens' conduct was unwelcome and contributed to a hostile working environment. She also says she reported Stevens' inappropriate conduct to her supervisor but KPI took no remedial steps. KPI, on the other hand, says Stevens' overtures were not unwelcome; the alleged harassment to which Flanagan was subjected was neither severe nor pervasive; and Stevens' conduct was neither objectively nor subjectively offensive. See Defendant's memorandum (document no. 22) at 18. KPI also asserts that Stevens was not Flanagan's supervisor and denies that Flanagan has established sufficient facts to impose liability on it for Stevens' allegedly unlawful conduct.

Plainly, there are numerous disputed issues of material fact related to Flanagan's hostile work environment claims under Title VII and RSA 354-A. Accordingly, to the extent defendant seeks summary judgment as to count 2 (Title VII) and count 3 (RSA 354-A) of plaintiff's complaint, its motion is denied.

II.  The Family Medical Leave Act.

A.  General Provisions.

In 1993, Congress enacted the FMLA "to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition."  29 U.S.C. § 2601(b)(2).  The FMLA applies to individuals who have worked for at least 1,250 hours during the previous year at a company that employed 50 or more employees for at least 20 weeks of the year.  See 29 U.S.C. § 2611(2) and (4).  There is no dispute that KPI meets the FMLA's definition of "employer" or that Flanagan is an eligible employee.

The FMLA provides that eligible employees are entitled to up to twelve weeks of leave per year for any one of several reasons: "when the employee has a serious health condition that makes him or her unable to perform the functions of his or her position; to care for a close family member with such a condition; or because of the birth, adoption, or placement in foster care of a child." Hodgens v. General Dynamics Corp., 144 F.3d 151, 159 (1st Cir. 1998) (citations and internal quotation marks omitted).

11

Following a qualified absence, the employee is entitled to return to the same or similar position, with equivalent pay, benefits, and other conditions of employment, and without loss of accrued seniority. 29 U.S.C. § 2614. See also 29 C.F.R. § 825.100(c). Additionally, leave authorized by the FMLA need not necessarily be taken all at one time. So, for example, leave may be taken intermittently, when "medically necessary for planned and/or unanticipated medical treatment of a related serious health condition by or under the supervision of a health care provider, or for recovery from treatment or recovery from a serious health condition." 29 C.F.R. § 825.203(c).

The FMLA also protects the exercise of rights conferred upon eligible employees by making it unlawful for employers to discriminate against those who take leave authorized by the Act.

> In addition to creating the above entitlements, the FMLA provides protection in the event an employee is discriminated against for exercising those rights. In particular, "an employer is prohibited from discriminating against employees . . . who have used FMLA leave." Nor may employers "use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions."

Hodgens, 144 F.3d at 159-60 (citations omitted).

12

In this case, Flanagan invokes the FMLA provision that entitles eligible employees to leave when they suffer from "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Specifically, Flanagan says her chipped tooth (and the complications that arose from it) amounted to a "serious health condition" because it required continuing treatment by a health care provider and because the pain it caused rendered her unable to perform the functions of her job. See Complaint at paras. 55-57. She claims that she was unlawfully fired as a result of having taken leave authorized by the FMLA and, therefore, says she is entitled to damages from KPI. In response, KPI asserts that Flanagan's dental problem was not a serious health condition, as defined in the FMLA, and, therefore, she was not protected by the Act's anti-discrimination provisions.

B.    "Serious Health Condition."

Whether an employee suffers from a "serious health condition" is a question of law. See Haefling v. United Parcel Service, Inc., 169 F.3d 494, 499 (7th Cir. 1999) ("Whether an

13

illness or injury constitutes a 'serious health condition' under the FMLA is a legal question that an employee may not sidestep in the context of summary judgment merely by alleging his condition to be so."). The FMLA defines a "serious health condition" as an illness, injury, impairment, or physical or mental condition that involves:

> (A) inpatient care in a hospital, hospice, or residential medical care facility; or
>
> (B) continuing treatment by a health care provider.

29 U.S.C. § 2611(11). Regulations promulgated by the Department of Labor provide additional detail in describing precisely what is meant by a "serious health condition." See generally 29 C.F.R. § 825.114.

Flanagan's dental condition did not require "inpatient care in a hospital, hospice, or residential medical facility." 29 U.S.C. § 2611(A). Consequently, to constitute a "serious medical condition" under the FMLA, it must have required "continuing treatment by a health care provider." 29 U.S.C. § 2611(B). Generally speaking, for an illness or ailment to qualify as a serious health condition that requires continuing treatment, the

14

employee must demonstrate he or she suffered a period of incapacity that: (1) continued for more than three consecutive calendar days; (2) was due to pregnancy; (3) resulted from treatment for a "chronic serious health condition"; (4) was permanent or long-term, due to a condition for which treatment may not be effective (e.g., stroke, Alzheimer's, etc.); or (5) resulted from the employee's need to receive multiple treatments for restorative surgery after an accident or for a condition that would likely result in a period of incapacity for more than three days if left unattended (e.g., chemotherapy, radiation, dialysis).  See 29 C.F.R. § 825.114(a).

Because she cannot demonstrate that the alleged incapacity caused by her dental condition lasted for more than three consecutive calendar days, or that it was pregnancy related, or that it resulted from treatment for a condition such as Alzheimer's, cancer, or kidney failure, Flanagan asserts that she suffered from a "chronic" serious health condition - a specific subset of serious health conditions that require continuing treatment by a health care provider.  The pertinent regulations define a "chronic serious health condition" as one which:

15

> (A) Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider; [and]
>
> (B) Continues over an extended period of time (including recurring episodes of a single underlying condition); and
>
> (C) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

29 C.F.R. § 825.114(a)(2)(iii).

In support of her claim that her dental condition meets the definition of a chronic serious health condition, Flanagan says: (1) during the one month period between May 18, 1999 and June 22, 1999, she saw her dentist and/or oral surgeon on seven occasions; and (2) when she eventually developed dry socket, it caused a "longstanding infection" and "significant pain." See Flanagan Affidavit at para. 8. See also Plaintiff's memorandum (document no. 21) at 13. Based upon those facts, she simply declares that her "recurring dental problem is precisely the type of condition envisioned by this regulation." Id., at 12. The court disagrees.

16

Flanagan never specifically invoked the provisions of the FMLA or told KPI that she believed she was entitled to FMLA leave to attend to her dental problem.  And, regardless of whether she provided KPI with sufficient information about the nature of her dental condition for KPI to deduce that it might qualify her for protected leave under the FMLA, see 29 C.F.R. § 805.303(b), that dental condition did not, as a matter of law, constitute a "chronic serious health condition."  Consequently, her unexcused absences to attend dental appointments were not protected by the FMLA and KPI was not precluded from considering those absences when it decided to terminate Flanagan's employment.

First, the legislative history of the FMLA "indicates that the FMLA 'is not intended to cover short-term conditions for which treatment and recovery are very brief.'  These types of conditions typically fall within an employer's sick leave policy."  Bond v. Abbott Laboratories, 7 F. Supp. 2d 967, 973 (N.D. Ohio 1998) (citation omitted).  See also Olsen v. Ohio Edison Co., 979 F. Supp. 1159, 1163 (N.D. Ohio 1997) ("Congress did not intend to include within the FMLA's protections 'minor illnesses which last only a few days and surgical procedures

17

which typically do not require hospitalization and require only a brief recovery period.'  The slings and arrows of everyday life, in Congress' view, should not be the stuff of a federal statute, nor federal litigation based on it.") (citations omitted).  Here, the record reveals that Flanagan's dental treatments were relatively routine and were performed on an outpatient basis (i.e., did not require hospitalization).  While she obviously suffered some side effects, none was particularly serious, long-lasting, or out of the ordinary.

Second, in defining a "serious health condition," the regulations specifically exclude "routine dental or orthodontia problems, periodontal disease, etc."  29 C.F.R. § 825.114(c).  Only if it "meet[s] all the other conditions of this regulation" is "restorative dental . . . surgery" within the scope of a serious health condition.  Id.  See also 29 C.F.R. § 825.114(b) (excluding from the definition of "treatment" any routine dental examinations).  Simply stated, the record does not support the conclusion (nor has Flanagan attempted to show) that her dental condition meets all of the other conditions set forth in the applicable regulation.

Finally, notwithstanding her claim to the contrary, Flanagan's dental condition cannot reasonably be described as "chronic" because she did not suffer from it (or its side effects) for a sufficiently lengthy period of time. To constitute a "chronic" illness, the patient's condition must "continue[] over an extended period of time." 29 C.F.R. § 825.114(a)(2)(iii)(B). While the regulations fail to define what is meant by an "extended period of time," the language of the FMLA itself, its legislative history, and the regulations promulgated pursuant to that statute all suggest that to constitute a "chronic" illness, the condition must exist for well more than a few weeks.

Here, Flanagan's "condition" continued for, at most, a month before it was fully resolved. It never caused her to miss consecutive days of work. In fact, she was able to return to work after each visit to the dentist (though she was sent home on one occasion). Nor is there any evidence that her dental condition limited her daily activities (other than the day she says side-effects from one of her medications caused her to be too ill to attend work) or interfered with her ability to

19

maintain an active social life. Nor is there any evidence that suggests that her dental condition, now that it has been resolved, will likely cause her any pain or disability, or require any continuing treatment, in the future. An ailment of that sort, from which the patient has completely recovered, simply fails to constitute a chronic condition. See, e.g., 29 C.F.R. § 825.114(a) (giving, as examples of chronic serious health conditions, asthma, diabetes, Alzheimer's disease, and epilepsy). See also Stedman's Medical Dictionary (26th ed. 1995) (defining "chronic" as: "(1) Referring to a health-related state, lasting a long time. (2) Referring to exposure, prolonged or long-term, sometimes meaning also low-intensity. (3) The U.S. National Center for Health Statistics defines a chronic condition as one of three month's duration or longer.") (emphasis supplied). See generally Price v. Marathon Cheese Corp., 119 F.3d 330, 334-35 (5th Cir. 1997) (holding that plaintiff's carpal tunnel syndrome did not constitute a chronic serious health condition); Cole v. Sisters of Charity of the Incarnate Word, 79 F. Supp. 2d 668, 671-72 (E.D. Tex. 1999) (holding that plaintiff's stress did not constitute a chronic serious health condition); Beal v. Rubbermaid Commercial Prods., Inc., 972 F.

20

Supp. 1216, 1224-25 (S.D. Iowa 1997) (holding that although plaintiff's eczema caused her to be incapacitated for more than one day and periodically forced her to leave work, it fell "far short of the sort of chronic problems entailing episodic periods of incapacity contemplated by the FMLA, such as diabetes and epilepsy."); Bauer v. Dayton-Walther Corp., 910 F. Supp. 306, 310 (E.D. Ky. 1996) (holding that plaintiff's rectal bleeding "falls far short of the sort of chronic serious health problems such as diabetes and epilepsy within the purview of the FMLA.").

As noted by the district court in Bauer, "Congress sought to parse out illnesses which it believed should be treated under sick leave policy from those much more serious illnesses that implicate the protections of the FMLA." Id., at 310. Flanagan's chipped tooth, and the relatively minor and short-term complications that arose from it, cannot plausibly be placed in the latter category. Consequently, because Flanagan's dental ailment fails to constitute a "chronic serious health condition," and because the record reveals that it does not meet the elements of any other "serious health condition," the unexcused absences

21

caused by her periodic dental appointments were not protected by the FMLA.

## Conclusion

The existence of genuine issues of material fact preclude the entry of judgment as a matter of law in favor of KPI on Flanagan's Title VII and RSA 354-A claims. As to Flanagan's FMLA claim, however, KPI has demonstrated that it is entitled to summary judgment.

KPI's motion for summary judgment (document no. 22) is, therefore, granted in part, and denied in part. As to Flanagan's FMLA claim (count 1), KPI is entitled to judgment as a matter of law and its motion is granted. In all other respects, however, that motion is denied. KPI's motion for leave to file a supplemental memorandum of law (document no. 36) is denied as moot. Flanagan's motion for summary judgment as to her FMLA claim (document no. 21) is denied.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

February 25, 2002

cc:  Linda S. Johnson, Esq.
     Mark T. Broth, Esq.