Carol BRADLEY, Plaintiff,

v.

**MARY RUTAN HOSPITAL ASSOC., Defendant.**

No. 02–CV–797.

United States District Court,
S.D. Ohio,
Eastern Division.

June 28, 2004.

Gary A. Reeve, Reeve & Watts, Worthington, OH, Patrick Michael Watts, Cleveland, OH, for Plaintiff.

Lisa Lomax Norris, Allen Kuehnle & Stovall, Scott Evan Williams, Hammond & Sewards, Columbus, OH, for Defendant.

**1.** Plaintiff also seeks an order of immediate reinstatement within her Motion. *See infra* for more. Because the Court concludes, however, that summary judgment is not warranted for either party, Plaintiff's claim for reinstatement is **DENIED** as premature. Since the Court finds that Plaintiff cannot state a claim under the FMLA for her own alleged serious health condition, reinstatement would not come under § 2614(a) for failure to restore, because the only issue that may remain for trial is whether Mary Rutan used Brad-

## OPINION & ORDER

MARBLEY, District Judge.

### I. INTRODUCTION

This matter is before the court on several motions. The parties have filed cross-motions for summary judgment, although Plaintiff's, Carol Bradley's ("Plaintiff" or "Bradley"), Motion is on the issue of liability only.[1] Plaintiff also filed a Motion to Strike Portions of an Affidavit of Timothy Froebe, which was filed in support of Defendant's, Mary Rutan Hospital Association's ("Defendant" or "Mary Rutan"), Motion for Summary Judgement. For the following reasons, the Court **DENIES** Plaintiff's Motion to Strike and **DENIES** the parties' cross-motions for summary judgment.

### II. FACTS

On February 7, 2000, Mary Rutan hired Bradley as a full-time cook. During her employment, Nyoka Foor ("Foor"), Director of the Dietary Department at Mary Rutan, was Bradley's supervisor. The parties dispute when Foor first became aware of such, but Bradley's husband, Mr. Bradley, has Parkinson's Disease, which requires frequent care-giving from his wife and other family members. During the first year of her employment, before Bradley became eligible for leave under the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.*, she was absent or tardy on at least eight (8) different occasions.[2] The parties agree that she re-

ley's FMLA leave for her husband's condition against her in its decision to terminate her. Should this case proceed to trial on that issue, and should Plaintiff be successful in proving that Defendant violated the FMLA, it may be appropriate at that later time to consider whether reinstatement relief is available to Plaintiff under 29 U.S.C. § 2617(a), as requested in Plaintiff's Amended Complaint, ¶ 25.

**2.** In its Motion for Summary Judgment, Defendant states that Bradley was absent or

ceived her first oral warning for excessive absenteeism on November 12, 2000.[3] Mary Rutan then gave Bradley a second warning on March 8, 2001, and a third reprimand on May 16, 2001. Plaintiff alleges that her absences on March 7, 2001, and those leading up to her third warning were for the purpose of caring for her husband.

The third reprimand resulted in Bradley being issued an Employee Warning Record ("Warning Record"). The Warning Record stated that Bradley formally had been warned of her absenteeism on three prior occasions and that any further absences within the following ninety days may result in termination of her employment. Bradley signed the statement, acknowledging that she read it and understood the consequence that "further misconduct may result in additional discipline up to and including discharge."

On or about June 7, 2001, Mr. Bradley was admitted to Wilson Memorial Hospital after he became severely ill. After his discharge on June 11, 2001, Foor and Bradley discussed Mr. Bradley's Parkinson's Disease, and Foor recommended that Bradley check with Mary Rutan's human resources department to see if she qualified for FMLA leave. Bradley did so, and Mary Rutan approved FMLA leave for Bradley from June 13, 2001, to July 13, 2001. Defendant contends that this was Bradley's first and only request for FMLA leave. Plaintiff argues, however, that Mary Rutan had knowledge of her husband's condition, and her need to care for him, before she accepted employment with Defendant.

On August 28, 2001, Bradley allegedly injured her right hand by hitting it against a salad bar when walking past it. Bradley continued working, though, and did not see a doctor until the next day. On August 29, 2001, Bradley was seen by Doctor Catherine Watkins–Campbell ("Dr.Campbell"), a physician at Mary Rutan. Dr. Campbell diagnosed Bradley as having a right trapezoid strain and contusion to the right hand. She permitted Bradley to go back to work that same day, but restricted her to performing left-handed work only.

Both parties agree that Bradley informed Foor of this restriction on the day that Dr. Campbell prescribed it, although they dispute Foor's reaction and whether Bradley provided Foor with the actual Employee Work Restriction Form. Foor testified that Bradley did not show her "any paperwork which described what a 'left-handed job' restriction meant" and that she needed written restrictions from a doctor in order to accommodate Plaintiff. Foor claims to have told Bradley to just perform her job duties that did not require use of her left hand.

Bradley, in contrast, claims that she immediately took the Employee Work Restriction Form to Foor, and that Foor laughed, said there were no left-handed jobs available, and told Bradley that she was headed out of town on a business trip and did not have time to deal with the restrictions. Nevertheless, it is undisputed that Bradley continued to work August 29, 2001, through August 31, 2001, despite the restrictions.

At Bradley's next follow-up appointment with Dr. Campbell on September 4, 2001,

---

tardy on eight occasions, whereas in her Affidavit, Foor avers that it was nine. This is one example of the myriad of conflicting evidence offered by the parties in this case (conflicting even amongst themselves, but especially be-

tween them), making summary judgment improper.

3. Plaintiff points out that there was no written record of this oral warning, which is contrary to Mary Rutan's policy.

while Foor was still away on business, Bradley told the doctor that her job duties had not been modified and that Foor had refused to accommodate the restrictions. Consequently, Dr. Campbell took Bradley off work until her next appointment on September 11, 2001. At the September 11, 2001 appointment, Dr. Campbell extended Bradley's time off, again, until her next appointment on September 25, 2001.[4]

Meanwhile, Foor returned from her business trip on September 10, 2001, after having been informed by her assistant that Bradley's Employee Work Restriction Status had changed and that she had been taken off work completely. Around this time and without contacting Bradley first to obtain her permission,[5] Foor contacted Dr. Campbell directly to inquire about the specifics of Plaintiff's work restrictions. As a result of that discussion, Dr. Campbell provided Foor, via facsimile, with a new, "revised" Employee Work Status Report, which permitted Bradley to return to work on September 13, 2001, to perform restricted, clerical duties.

After receiving the new Employee Work Status Report and trying to contact Bradley at her home to no avail, Foor sent a letter to Plaintiff via certified mail informing her that Mary Rutan had considered Dr. Campbell's restrictions and found that it could accommodate them by placing Bradley in a position at Mary Rutan. The letter requested Bradley to phone Foor as soon as possible to discuss the position and her return date. Upon receiving the letter, Bradley phoned Foor and they met on September 21, 2001, to discuss the special clerical duties Bradley was going to perform at Mary Rutan.

Plaintiff contends that she was never made aware of the contact between Foor and Dr. Campbell and did not know that her restrictions had been changed as a result. Defendant contends that Bradley knew of the "new" restrictions and authorization to return to work on September 13, 2001, either because Bradley picked up a copy of the September 13, 2001, Employee Work Status Report prior to meeting with Foor on September 21, 2001, or because Foor had provided a copy of the new Report to her via certified mail.[6]

The parties do not dispute that during the meeting Foor instructed Bradley to return to work on September 24, 2001. They also do not dispute that Bradley told Foor that she and/or her husband had appointments that day. Nevertheless, it seems that the two women parted with different understandings. Bradley be-

4. The parties dispute whether Bradley should have reported to work on September 25, 2001. The Employee Work Status Report filled out by Dr. Campbell at Bradley's September 11, 2001 appointment does not make clear whether the work status was valid *through* the 25th (until the 26th) or just until her appointment on the 25th. The language states merely that, "This work status in effect until re-evaluation." Regardless, because the Court concludes, for other reasons, that Bradley cannot base an FMLA claim on her alleged "serious health condition," the resolution of this factual issue is not necessary.

5. Plaintiff avers that Foor's contact with Dr. Campbell violated 29 C.F.R. § 825.307, because Foor did not obtain Bradley's permission. Because the Court concludes, however, that a reasonable jury could not find that Bradley's own condition met the definition of a "serious health condition," this issue need not be resolved, either.

6. In her affidavit, Foor states that Bradley specifically told her during the September 21, 2001 meeting that she had a copy of the "work restrictions." Assuming that were true, however, Plaintiff could have been referring to any number of the forms she had received from Dr. Campbell during her various appointments. Notably, Foor's affidavit does not aver, specifically, that Bradley unequivocally understood that Foor had contacted Dr. Campbell on her own accord and gotten "revised" work restrictions for her.

lieved that by asking her to return to work on September 24, 2001, Foor was asking her to violate Dr. Campbell's orders, although apparently Bradley never conveyed that sentiment to Foor during the meeting. In addition, because Bradley allegedly had an appointment(s) to attend on September 24, 2001, she contends that she did not have to return to work, despite Foor's insistence that she do so. Conversely, Foor claims to have believed that Bradley understood that she was to report to work on September 24, 2001 before her appointment(s), for a few hours to try out her new duties, and that Bradley would then be excused from work to attend to her appointment(s).

Plaintiff, however, neither reported to work, nor contacted Mary Rutan on September 24, 2001. On September 25, 2001, Bradley went to her follow-up appointment with Dr. Campbell, and although Dr. Campbell, again, released her back to work on that day, Bradley again did not report to work. Plaintiff claims that when she stopped by after her appointment to drop off the new Work Restriction Form, because it was after the time of her normal work hours and she did not see herself on the schedule, she assumed that she was not expected to work on that day. Defendant, on the other hand, contends that based on the September 21, 2001 meeting, Bradley knew that she was expected to report to work in her new position on September 24, 2001, and every day thereafter.

Regardless, Bradley did not work on September 25, 2001. On September 26, 2001, the first day on which there is no dispute that Bradley was suppose to report to work, she failed to appear. She phoned Mary Rutan to inform Defendant that she was experiencing car trouble and would arrive as soon as possible, but when she phoned a second time and spoke with Foor, Foor informed her that she had been terminated.

The decision to terminate Foor was made sometime prior to September 26, 2001, however, after Foor contacted Timothy Froebe ("Froebe"), the Vice–President of Human Resources at Mary Rutan. Froebe allegedly was the sole decision-maker, and he avers that he made the decision to terminate Plaintiff after Foor phoned him and informed him that Bradley had failed to report to work two days, without calling ("no-call, no-shows"). Based upon this and what Defendant viewed as Bradley's record of excessive absenteeism, Mary Rutan terminated Plaintiff for "abandoning her job."

### III. PROCEDURAL HISTORY

Bradley filed this lawsuit on August 13, 2002, and filed an amended complaint on March 19, 2003.[7] On November 21, 2003, Bradley filed a Motion for Summary Judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure. On the same day, Defendant filed its own Motion for Summary Judgment, which included as an exhibit and in support of its Motion, the

---

7. In her amended complaint, Plaintiffs also asserts a claim for wrongful discharge in violation of Ohio public policy. In its Motion for Summary Judgment, Defendant argued summary judgment was appropriate on this claim because neither Ohio courts nor this Court recognizes a wrongful termination claim that has its sole public policy basis in the FMLA. Plaintiff never addresses Defendant's argument in her Memorandum in Opposition.

Furthermore, Plaintiff makes no mention of her public policy claim in her own Motion for Summary Judgment. It appears that Plaintiff has abandoned her public policy claim or otherwise failed to respond and create a genuine issue of material fact that necessitates a trial on it. Therefore, the Court summarily **GRANTS** Defendant's Motion for Summary Judgment on Plaintiff's wrongful discharge claim.

affidavit of Timothy Froebe. On December 4, 2003, Defendant filed an identical copy of the Froebe affidavit independent of its Motion for Summary Judgment On December 15, 2003, Plaintiff filed a Motion to Strike portions of the Froebe affidavit. The Court heard oral arguments on the various motions on May 14, 2004, making them now ripe for decision.

## IV. STANDARD OF REVIEW

### A. Cross–Motions for Summary Judgment

■ The standard of review for cross-motions of summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Taft Broad. Co. v. U.S.*, 929 F.2d 240, 248 (6th Cir.1991). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits ..." *Id.* (citations omitted).

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

In evaluating motions for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In the case of cross-motions, the Court must "tak[e] care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft*, 929 F.2d at 248. The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). Significantly, in responding to a motion for summary judgment, however, the non-moving party "may not rest upon its mere allegations ... but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P.56(e); *see Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir.1994).

The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir.1993). Furthermore, the mere existence of a scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir.1995) (citing *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505).

## B. Motion to Strike

Affidavits submitted in support of a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavit." Fed.R.Civ.P. 56(e); *accord Monks v. Gen. Elec. Co.*, 919 F.2d 1189, 1192 (6th Cir.1990). "After a motion for summary judgment has been made, a party may not create a factual issue by filing an affidavit that contradicts her earlier deposition testimony." *Kelso v. City of Toledo*, 77 Fed.Appx. 826, 834, 2003 WL 22284122 (6th Cir.2003); *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.1986). Furthermore, "[i]f a witness, who has knowledge of a fact, is questioned during her deposition about that fact, she is required to 'bring it out at the deposition and cannot contradict her testimony in a subsequent affidavit.'" *Holt v. Olmsted Township Bd. Of Trs.*, 43 F.Supp.2d 812, 817 (N.D.Ohio 1998), quoting, *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir.1986).

## V. ANALYSIS

### A. Plaintiff's Motion to Strike Portions of Froebe's Affidavit

Plaintiff argues that Froebe's affidavit was filed after she filed her Motion for Summary Judgment, making it untimely. Plaintiff asserts, in the alternative, that even if the affidavit was filed timely, it conflicts with Froebe's deposition testimony, and therefore, the conflicting portions of the affidavit should be stricken. In response, Defendant asserts that the affidavit was timely because it was initially appended to Defendant's Motion for Summary Judgment, which was filed on the same day as Plaintiff's Motion. Additionally, Defendant argues that it is not attempting to introduce a new genuine issue of material fact, but simply attempting to clarify Froebe's confusing deposition testimony.

#### 1. Timeliness

Under the rule set forth in *Kelso v. City of Toledo*, a party may not create a material issue of fact through the filing of an affidavit once a motion for summary judgment has been filed. Here, the Froebe affidavit was filed as a exhibit to Defendant's Motion for Summary Judgment, which was filed on the same day— November 21, 2003—as Plaintiff's Motion for Summary Judgment. Therefore, since Froebe's affidavit was not filed after, or in response to Plaintiff's Motion for Summary Judgment, it is timely.

#### 2. Conflicting Statements

In *Holt*, after holding that a witness must give testimony regarding his or her knowledge of facts in a deposition, and not contradict such testimony in an ensuing affidavit, the court considered whether the affidavit statements *directly* contradicted the deposition testimony. 43 F.Supp.2d at 817–820. Here, Plaintiff argues that paragraph (9) of Froebe's affidavit conflicts with his deposition testimony. There, Froebe avers:

> 9. As I previously stated in my deposition, my decision to terminate Carole Bradley's employment was based on the fact that, despite having Employee Work Status Reports authorizing her to return to work on September 13, and September 25, 2001 ... she failed to report to work or call in to request approved time off on September 25 and 26, 2001. These absences are referred to as "no call, no shows" and provide sufficient basis to terminate an employee.

Plaintiff argues that this portion of his affidavit conflicts with Froebe's earlier deposition testimony that Bradley's termi-

nation was based on two no-call, no-show days, and that those days were Monday and Tuesday. Because Monday was September 24th and not the 25th, Plaintiff claims that Froebe's affidavit conflicts with his deposition testimony, and therefore it should be stricken.

Froebe's affidavit, however, does not conflict directly with his deposition testimony regarding the amount of no-call, no-show days that went into the decision to terminate Bradley. In his affidavit and during his deposition, Froebe maintained that he made the decision to terminate Bradley based on her two no-call, no-show absences in September of 2001, regardless of the specific dates of those two days.

As for the dispute over the actual dates of those absences, on several occasions during Froebe's deposition, he states that he considered September 25, 2001, as Bradley's return date. He also states that if September 25th was a Tuesday, he believed that Bradley's return date was Tuesday, instead of Monday, as he had stated earlier in his deposition. According to the portions of the Froebe deposition filed with the Court, at no time, however, does Froebe designate September 24th as a day that he included as one of the two no-call, no-show days.[8] Therefore, since Froebe's deposition states that he believed Bradley was to return on September 25, 2001, and his affidavit states that Bradley's termination was based on no-call, no-show absences on September 25 and 26th, the

affidavit does not conflict with Froebe's testimony.

Because the Froebe affidavit is timely and does not conflict directly with his prior deposition testimony, Plaintiff's Motion to Strike is **DENIED.**

## B. Parties' Cross–Motions for Summary Judgment

In her Motion, Plaintiff first argues that the *McDonnell Douglas* burden-shifting analysis[9] should not apply to her case. She relies on *King v. Preferred Technical Group,* 166 F.3d 887, 891 (7th Cir.1999), holding that an employee asserting an FMLA "interference" claim need only show that she was entitled to the benefit denied. Plaintiff maintains that she was entitled to FMLA leave for two separate reasons: 1) to care for her husband, 29 U.S.C. § 2612(a)(1)(C); and 2) for her own serious health condition, 29 C.F.R. § 825.114(a)(2)(i), which she allegedly sustained from hitting her hand on the salad bar while walking past it. Bradley argues, further, that she gave proper notice to Mary Rutan in both instances. Finally, she argues that Defendant violated the FMLA in two respects: by using the time off to care for her husband as a negative and contributing factor in its decision to discharge her; and second, by using the FMLA-qualifying absences due to her own serious health condition as a factor in its decision to terminate her.

8. Froebe does state in his deposition that according to Foor, Bradley was supposed to work on Monday, September 24th, but he does not state that he included the 24th in his decision to terminate Bradley.

9. Under the *McDonnell Douglas* framework, the burden of proof alternates between the parties. First, a plaintiff alleging discrimination must establish a *prima facie* case of discrimination. Once the plaintiff does that, the burden shifts to the defendant to offer a legiti-

mate, non-discriminatory reason for the adverse employment action at issue. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (citing *McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). If the defendant meets this burden, then the burden of production shifts back to the plaintiff to demonstrate that the proffered reason is false. *Id.* (citing *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817).

Defendant responds by arguing that to prove her "interference and reinstatement" claim under 29 U.S.C. § 2615(a)(1) and § 2614(a)(1), Plaintiff must prove Mary Rutan's legitimate, nondiscriminatory reasons for terminating her were insufficient, and she would not have been terminated if she had not taken FMLA leave. It claims that Bradley would have been fired for job abandonment regardless of, and without respect to, her FMLA leave, so Plaintiff's claims fail as a matter of law.

Regarding her claim of FMLA leave to care for her husband, Mary Rutan contends that Bradley has not proven that she was entitled to take FMLA leave for her March 7, 2001, absence because she has not provided any objective evidence that on that day her husband had a serious health condition or that she was needed to care for him. Defendant urges, furthermore, that the facts surrounding Bradley's notice of her intent to take leave to care for her husband are hotly disputed.

Next, Defendant disputes Bradley's entitlement to take leave for what she alleges to have been her own serious health condition, but contends that it, effectively, gave her leave at any rate, from September 4 through 21 of 2001. Bradley's termination, Defendant professes, was solely because of her no-call, no-show absences on September 24 and/or 25 and 26, 2001, and she has failed to provide any evidence that those absences were not a sufficient reason for her discharge.

Defendant's Cross–Motion for Summary Judgment, filed the same day as Plaintiff's Motion, also begins by proposing the appropriate framework of analysis. According to Defendant, Plaintiff's claim is one of "retaliatory discharge," for which the Sixth Circuit has adopted the *McDonnell Douglas* burden-shifting framework in *Skrjanc v. Great Lakes Power Service*, 272 F.3d 309, 315 (6th Cir.2001). Under *Skrjanc*, Mary Rutan argues, Plaintiff cannot establish a *prima facie* case because, even assuming her salad bar injury qualified as a "serious health condition," there is no evidence that she sought FMLA leave after Dr. Campbell released her back to work on September 13, 2001. According to Defendant, after the September 21, 2001, meeting between Bradley and Foor, Bradley was aware that Foor wanted her to report to work on September 24, 2001, yet Bradley failed to do so on that date and the following two days.

Defendant argues that it offered Bradley an alternative position doing clerical work, and she was authorized and required to report back to work beginning September 24, 2001 (at the latest), to perform that alternative position. The decision to terminate her was made by Froebe, and as stated in his letter to Plaintiff, it was based upon Bradley's no-call, no-show absence on September 25, 2001 and her "continued excessive absenteeism." In other words, Defendant disputes that Bradley can show a causal connection between any FMLA leave and her termination. Finally, Defendant posits, as it did in replying to Plaintiff's Motion, that Bradley cannot show pretext and rebut its legitimate, nondiscriminatory reason for discharging her.

Because in its Motion, Defendant addressed only Bradley's leave for her own condition, Plaintiff does not address the leave for her husband's condition in her Memorandum in Opposition, but stands on the arguments in her own Motion. Plaintiff contests the appropriate legal framework with which to analyze FMLA claims. Using her framework, Bradley argues that Mary Rutan acted unlawfully when it used her FMLA-qualified absences to care for her husband in its decision to terminate her and then by refusing to return her to her position upon her return from the FMLA-qualifying leave for her own condition in violation of § 2614(a). According to

Bradley, she was entitled to FMLA leave through September 25, 2001, because her condition qualified as a serious health condition.

Furthermore, Bradley states that Dr. Campbell ultimately took her off work until her follow-up appointment on September 25, 2001, after which she had no reason to know she had to return to work. Bradley contends that September 26, 2001 was when she was aware that she was supposed to return to work, which she attempted to do, despite transportation problems, until Foor notified her that she had been discharged. Mary Rutan cannot hold her responsible for not knowing of the "new" restrictions obtained by Foor, Bradley avers, because she was never informed of them, and Foor obtained them unlawfully by failing to get her approval before contacting Dr. Campbell.

Finally, Plaintiff responds that because she was on continuous FMLA leave, she was entitled to reject her employer's offer of light duty, which was made to her by Foor during the September 21, 2001, meeting and rejected that day. Bradley argues that her notice of intent to take leave for her condition was proper because she completed an injury report and provided Mary Rutan with the Work Status Report that took her off work through September 25, 2001. Thus, Plaintiff concludes, Mary Rutan denied her a benefit by using her FMLA-qualifying leave as grounds for her discharge.

**1. Appropriate Framework of Analysis**

Under the FMLA, there are two statutory provisions in § 2615 that regulate an employer's conduct:

(a) Interference with rights

(1) Exercise of rights

It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

(2) Discrimination

It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

29 U.S.C. § 2615. Section 2614(a) also regulates an employer's conduct by requiring the employer to restore an employee out on FMLA leave back to the position she occupied (or an equivalent one) upon her return. It states:

... any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave—

(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or

(B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment ...

29 U.S.C. § 2614(a)(1)(A) and (B). Section 2614(a)(2) regulates an employer's conduct by prohibiting the employer from taking benefits away from an employee because she takes leave:

The taking of leave under section 2612 of this title shall not result in the loss of any employment benefit accrued prior to the date on which the leave commenced.

29 U.S.C. § 2614(a)(2). But, then § 2614 also qualifies that:

[n]othing in this section shall be construed to entitle any restored employee to—

(A) the accrual of any seniority or employment benefits during any period of leave; or

(B) any right, benefit, or position of employment other than any right, benefit, or position to which the employ-

ee would have been entitled had the employee not taken the leave.

29 U.S.C. § 2614(a)(3)(A) and (B).

■ In addition, the implementing regulations[10] regulate employer conduct.[11] As stated in 29 C.F.R. § 825.220(b), "[a]ny violations of the Act *or of these regulations* constitute interfering with, restraining, or denying the exercise of rights provided by the Act." 29 C.F.R. § 825.220(b) (emphasis added). *See also Schmauch v. Honda of America Manufacturing, Inc.,* 295 F.Supp.2d 823, 828 (S.D.Ohio 2003). Hence, an employer violates the FMLA when it violates either the FMLA statute itself (§ 2615 *et seq.* or § 2614 *et seq.*) or its implementing regulations.[12] *See also Schmauch,* 295 F.Supp.2d at 831.

■ It seems clear, then, that there are a variety of ways that an employer can violate the FMLA. Hence, an employer acts unlawfully: 1) by interfering with, restraining or denying the exercise (or attempt to exercise) of FMLA rights (§ 2615(a)(1)); 2) by discharging or discriminating against an individual for opposing practices made unlawful by the Act (§ 2615(a)(2)); 3) by failing to restore an employee out on FMLA leave back to her position, or an equivalent one, upon her return (§ 2614(a)(1)); 4) by taking away benefits an employee had accrued prior to her leave, as a result of her taking leave (§ 2614(a)(2)); 5) by refusing to authorize FMLA leave or discouraging an employee from taking leave (§ 825.220(b)); 6) by discriminating against an employee for taking leave (§ 825.220(c)); and 7) by using the taking of FMLA leave as a negative factor in employment actions, such as hiring, promoting or disciplining (§ 825.220(c)). These encompass both an employer's prescriptive obligations and its proscriptive obligations. *See Chaffin v. John H. Carter Co., Inc.,* 179 F.3d 316, 319 (5th Cir.1999) ("employers have a *prescriptive obligation* under the FMLA—they must grant employees substantive rights guaranteed by the FMLA—*and they have*

10. These implementing regulations are promulgated by the Secretary of Labor. 29 U.S.C. § 2654.

11. Section (a) of § 825.220 essentially tracks the language of the statute itself.

The FMLA prohibits interference with an employee's rights under the law, and with legal proceedings or inquiries relating to an employee's rights. More specifically, the law contains the following employee protections:
(1) An employer is prohibited from interfering with, restraining, or denying the exercise of (or attempts to exercise) any rights provided by the Act.
(2) An employer is prohibited from discharging or in any other way discriminating against any person (whether or not an employee) for opposing or complaining about any unlawful practice under the Act.

29 CFR § 825.220(a)(1) and (2).

12. Other relevant regulations controlling an employer's conduct are found in 29 C.F.R.

§ 825.220, entitled: "How are employees protected who request leave or otherwise assert FMLA rights?" For example, section (b) states, in pertinent part:

"Interfering with" the exercise of an employee's rights would include, for example, *not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.*

29 CFR § 825.220(b) (emphasis added). And, section (c) provides that:

An employer is *prohibited from discriminating against employees* or prospective employees *who have used FMLA leave.* For example, if an employee on leave without pay would otherwise be entitled to full benefits (other than health benefits), the same benefits would be required to be provided to an employee on unpaid FMLA leave. By the same token, *employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as* hiring, promotions or *disciplinary actions;* nor can FMLA leave be counted under "no fault" attendance policies.

*a proscriptive obligation—they may not penalize employees for exercising these rights.*") (emphasis added).

In a case recently decided, this Court adopted the preponderance of the evidence standard, pioneered by the Seventh and Ninth Circuits, for analysis of FMLA claims falling under § 2615(a)(1). *Schmauch*, 295 F.Supp.2d at 831. This Court agreed with the Ninth Circuit's framework of analysis, set forth in *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1125 (9th Cir.2001):

> In order to prevail on her claim, therefore, [plaintiff] need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her. She can prove this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both. No scheme shifting the burden of production back and forth is required.

295 F.Supp.2d at 831, quoting, *Bachelder*, 259 F.3d at 1125. In *Schmauch*, this Court also discussed, at length, the current, confusing state of FMLA law.[13] It noted that many courts (or parties, as is more likely the case) do not identify under which section(s) of the statute plaintiffs bring their claims and instead use labels such as "interference," "discrimination," or "retaliation." *Schmauch*, 295 F.Supp.2d at

830. Courts use different, sometimes conflicting, frameworks for analyzing the claims, as illustrated by the caselaw cited in the parties' cross-motions. The courts often do not make clear, however, whether the framework they establish and/or employ should apply only to factually similar cases, only to cases bearing the same label, or only to claims arising under the specific statutory section(s). Accordingly, while several frameworks have been created, often it is impossible to discern when a particular framework should apply, especially when the parties do as they did here, and argue different frameworks, labels and sections.

Here, because Plaintiff did not designate within her complaint the section of the FMLA under which she brings her claims (§ 2615(a)(1), § 2615(a)(2) or § 2614), the parties spend an inordinate amount of effort trying to pigeonhole Bradley's claims and contesting which characterization fits the "hole" best. Plaintiff summarily cites § 2615(a)(1) in her own Motion for Summary Judgment, but then largely ignores its language and instead argues that Mary Rutan violated the FMLA by using her FMLA-qualified leave as a "negative factor" in contravention of 29 C.F.R. § 825.220(c). Bradley also seeks an order for immediate reinstatement in her Motion but does not allege therein that Defendant's actions were unlawful for failure to reinstate her under § 2614(a).[14] In fact,

---

29 CFR § 825.220(c) (emphasis added).

**13.** In *Schmauch*, for example, this Court also noted how the plain language of the statute really did not capture the facts of that case and was unhelpful in resolving it. 295 F.Supp.2d at 829. Likewise, here, the Court would be straining to characterize Bradley's claim as falling neatly under either § 2615(a)(1) or (2). *See infra.*

**14.** Section 2614, titled, "Employment and Benefits Protection" states:

(a) Restoration to position
(1) In general

Except as provided in subsection (b) of this section, any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave—
(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or
(B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment ...
(3) Limitations
Nothing in this section shall be construed to entitle any restored employee to—

Plaintiff's amended complaint brings her claim for reinstatement under § 2617(a), not § 2614(a).

Yet, for the first time and in response to Defendant's Motion, Plaintiff alleges that Defendant specifically violated § 2614(a) by not reinstating her after her own serious health condition, and ultimately, in its Reply, Defendant characterizes Plaintiff's claims as under 2615(a)(1), 2614(a)(1) and 2615(a)(2). Mary Rutan contends that under any and all of those provisions, the *McDonnell Douglas* framework applies.

 In its Memorandum in Opposition to Plaintiff's Motion, however, Defendant refers to Plaintiff's claim as an "interference and reinstatement claim under 29 U.S.C. 2615(a)(1) and 2614(a)(1)." Mary Rutan then creates a new framework of analysis for what it has labeled an "interference and reinstatement" claim—one, incidentally, that differs from the one it posed in its own Motion. To prove an "interference and retaliation" claim,[15] Mary Rutan would require Bradley to establish that:

(1) she was an "eligible employee;"

(2) Mary Rutan is an employer;

(3) she was entitled to take leave;

(4) she gave Mary Rutan notice of her intention to take leave;

(5) Mary Rutan denied her FMLA benefits to which she was entitled; and

(A) the accrual of any seniority or employment benefits during any period of leave; or

(B) any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave.

29 U.S.C.A. § 2614.

15. *But see Manns v. ArvinMeritor, Inc.,* 291 F.Supp.2d 655, 659 (N.D.Ohio 2003) (referring to the plaintiff's claim as that the defendant "retaliated" or "interfered" with his FMLA rights and then reciting two different

(6) Mary Rutan's legitimate non-discriminatory reasons for terminating her were insufficient and she would not have been discharged if she had not taken FMLA leave.

Defendant's Memorandum in Opposition, p. 5. According to Defendant, the sixth element is necessitated by 2614(a)(1) because "the right to reinstatement under the FMLA is not absolute. An employer need not reinstate an employee who would have lost his job even if he had not taken FMLA leave." *Id.* at p. 6, quoting, *Pharakhone v. Nissan North America, Inc.,* 324 F.3d 405, 407 (6th Cir.2003), citing 29 U.S.C. § 2614(a)(3)(B).

Defendant, however, starts off in its Motion by labeling Bradley's claim as a "retaliatory discharge" claim, concluding that it falls under § 2615(a)(2) and setting forth this different framework for Plaintiff:

(1) she availed herself of a protected right under the FMLA;

(2) she was adversely affected by an employment decision; and

(3) there was a casual connection between the two actions.

Defendant's Motion, p. 10, citing, *Skrjanc v. Great Lakes Power Serv.,* 272 F.3d 309, 314 (6th Cir.2001). In her Memorandum in Opposition, Plaintiff, for the first time, argues that Defendant's actions, which she now characterizes as violating § 825.220(c)

frameworks—"To establish a retaliation claim, the plaintiff must show: 1) he availed himself of a protected right under the FMLA; 2) he was adversely affected by an employment decision; and 3) there was a causal connection between the two actions. *See Skrjanc v. Great Lakes Power Serv. Co.,* 272 F.3d 309, 314 (6th Cir.2001). To establish an interference claim, the plaintiff must show: 1) he was entitled to leave under the FMLA; 2) he gave notice of his intention to take FMLA leave; and 3) the employer denied FMLA leave/benefits to which plaintiff was entitled. *See, e.g., Cavin v. Honda of Amer. Mfg. Inc.,* 346 F.3d 713 (6th Cir.2003).").

and § 2614(a), also constitute "interference and restraint" under 29 C.F.R. § 825.220(b).

█ The problems with labels and having numerous frameworks are illustrated by this case. This Court prefers, instead, to adopt a single framework for all claims brought by a plaintiff who alleges that her employer used the fact that she took FMLA leave against her in some unlawful way (by discharging her, not promoting her, denying her benefits to which she otherwise would have been entitled ...). In such cases, plaintiff would have the burden of establishing that:

1. She is an "eligible employee," 29 U.S.C. § 2611(2);

2. Defendant is an "employer," 29 U.S.C. § 2611(4);

3. She was entitled to take leave for one of the reasons set forth in 29 U.S.C. § 2612(a)(1);

4. She gave proper notice of her intention to take leave, 29 C.F.R. § 825.302; and

5. The employer somehow used the leave against her and in an unlawful manner, as provided in either the statute *or* regulations.

Plaintiff has to prove each of those elements by a preponderance of the evidence in order to prevail.[16]

In defense, an employer can show how the plaintiff cannot meet one or more of those elements by a preponderance of the evidence, as, for example, by arguing that the plaintiff was not entitled to take leave, failed to provide adequate notice, or that the employer's decision was not adverse to the plaintiff or not based on the plaintiff's use of FMLA leave. As *Bachelder* recognized and as this Court concluded in *Schmauch*, "[n]o scheme shifting the burden of production back and forth is required." 295 F.Supp.2d at 831, quoting, 259 F.3d at 1125. In evaluating a motion for summary judgment, if there remains a genuine issue of material fact whether the plaintiff was entitled to take leave, for example, or whether, the defendant *violated* the FMLA, then it is for the jury *to* decide whom to believe.

With that framework in mind, the Court will analyze Plaintiff's two claims separately, but first noting that the parties do not dispute the first two elements: that Bradley became eligible for FMLA leave beginning February 7, 2001, making her an "eligible employee" as of that day; and

**16.** This framework is not very different from the one adopted by the Sixth Circuit in *Cavin v. Honda of Am. Mfg.*, 346 F.3d 713, 719 (6th Cir.2003) for so-called "interference claims." The only difference is that the *Cavin* court's other element was that the employee must establish that the "employer denied the employee FMLA benefits to which he was entitled." *Id.*, citing, *Price v. Multnomah County*, 132 F.Supp.2d 1290, 1297 (D.Or.2001). The use of "benefit" is curious but makes sense in the context of the facts in *Cavin*. There, the defendant denied the plaintiff FMLA leave because he failed to follow its leave policy. Thus, in that sense, Cavin was denied the *benefit* of taking his leave, or rather the benefit of having Honda count the leave he took as FMLA leave and not against him under its progressive disciplinary policy. Admittedly, if this Court were to struggle with linguistics, it, too, could characterize what Mary Rutan allegedly did as denying Bradley a benefit when, for example, it refused to acknowledge her leave for her own condition through September 25, 2001 and terminated her for her "no-call, no-show" on that day. The Court, however, does not feel compelled or bound to use this framework because the facts here do not fit neatly into the characterization of "interference." *See infra.* Moreover, the reason behind the Court's suggestion of the framework posed above is that courts should not have to pigeonhole plaintiffs' claims, fit them under either the language of § 2615(a)(1) or (2), or create a seemingly new cause of action for each label.

that Defendant is an "employer" for purposes of FMLA.

### 2. Plaintiff's Own Serious Health Condition

#### a. Entitlement to Take Leave

To prove that she was entitled to take leave under 29 U.S.C. § 2612(D) for her own serious health condition, Plaintiff must prove that her condition meets the definition of a "serious health condition." According to 29 U.S.C. § 2611, a "serious health condition":

means an illness, injury, impairment, or physical or mental condition that involves—

(A) inpatient care in a hospital, hospice, or residential medical care facility; or

(B) continuing treatment by a health care provider.

29 U.S.C. § 2611(11). The regulations provide further detail on the "continuing treatment" prong. They state:

A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:

(i) *A period of incapacity* (i.e., *inability to work,* attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) *of more than three consecutive calendar days, and* any subsequent treatment or period of incapacity relating to the same condition, that also involves:

(A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

(B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

29 CFR § 825.114(a)(2) (emphasis added). To prove that her condition was a *serious* health condition then, Bradley must show, initially, that she was incapacitated—here, unable to work—for more than three consecutive calendar days. *See, e.g., Bond v. Abbott Laboratories,* 7 F.Supp.2d 967, 973 (N.D.Ohio 1998), quoting *Olsen v. Ohio Edison Co.,* 979 F.Supp. 1159, 1164 (N.D.Ohio 1997) ("A plaintiff 'must first demonstrate that he suffered from a period of incapacity within the meaning of that regulation ... [because] ... this is a threshold consideration.' ... If a plaintiff cannot show that he or she had a condition that incapacitated him or her, 'the Court's inquiry is over and summary judgment is appropriate.' ").

In an attempt to do so, Plaintiff alleges that because she was off work from September 4, 2001 through September 25, 2001, she was incapacitated for more than three days. Defendant contends, however, that Plaintiff's knocking of her hand into the salad bar could not possibly be a serious health condition and that, at any rate, the only reason she was off work was because of her misrepresentation to Dr. Campbell that Mary Rutan would not accommodate the restrictions Dr. Campbell prescribed on August 29, 2001.

In considering the types of illnesses that Congress sought to protect under the FMLA, the court in *Olsen,* 979 F.Supp. at 1163, acknowledged that:

According to the legislative history, Congress did not intend to include within the FMLA's protections "minor illnesses which last only a few days and surgical procedures which typically do not re-

quire hospitalization and require only a brief recovery period." The slings and arrows of everyday life, in Congress' view, should not be the stuff of a federal statute, nor federal litigation based on it. Rather, Congress believed that quotidian afflictions like the common cold or flu should "be covered by even the most modest of employer sick leave policies" and chose not to legislate in that area. *Id.,* quoting, H.R.Rep. No. 8, 103rd Cong., 1st Sess., pt. I at 29 (1993). The types of illnesses that Congress had in mind are reflected in the legislative history:

> heart attacks, heart conditions requiring heart bypass of valve operations, *most* cancers, back conditions requiring *extensive therapy or surgical procedures,* strokes, *severe* respiratory conditions, spinal injuries, appendicitis, pneumonia, emphysema, *severe* arthritis, *severe* nervous disorders, injuries caused by *serious* accidents on or off the job, ongoing pregnancy, miscarriages, complications or illnesses related to pregnancy, such as severe morning sickness, the need for prenatal care, childbirth and recovery from childbirth.

H.R.Rep. No. 8, 103rd Cong., 1st Sess., pt. I at 29 (1993) (emphasis added). Plainly, as recognized by *Olsen,* Congress sought to protect employees suffering from *serious* illnesses only. As illustrated by the italicized adjectives, Congress even went so far as to qualify what this Court otherwise might be willing to view as a serious condition, by designating some afflictions as requiring that they be "serious," as, for example, respiratory ailments. Undoubtedly, Congress did not have in mind to protect employees with injuries such as those occasioned by knocking one's hand into a salad bar while walking past it. As reasoned in *Olsen:*

> arthritis is not necessarily covered, but *severe* arthritis is. The run-of-the-mill backache is not covered, but a backache

so severe that surgery or *extensive* therapy are required is. Obviously, Congress did not intend for an employee to stand on his or her FMLA rights whenever a need for aspirin or cold tablets arose.

979 F.Supp. at 1163 (emphasis original).

It is unavailing, moreover, for Plaintiff to argue that her condition was "serious" and that she was incapacitated for more than three days simply because she was taken off work for many days. Plaintiff did not even seek medical attention until the day after she bumped her hand, after she had worked through her pain and injury the day before. Then, Dr. Campbell's report on August 29, 2001, designates that Bradley can return to work ("RTW") on that very day, albeit with restrictions not to use her right hand. Such "diagnosis" or recommendation was not one that Plaintiff could get only from a medical professional. *See, e.g.,* 29 C.F.R. § 825.114(b) (in describing the type of "continuing treatment" required, it explained what was insufficient in stating: [a] regimen of continuing treatment that includes the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities *that can be initiated without a visit to a health care provider,* is not, by itself, sufficient to constitute a regimen of continuing treatment for purposes of FMLA leave.). It shows, moreover, that Plaintiff was not incapacitated, or made unable to work, *by her injury.* She was able to return to work on that very day.

Tellingly, Plaintiff acknowledges that the *only* reason Dr. Campbell took her off work completely during her September 4, 2001, follow-up visit was because Bradley told her that Mary Rutan would not accommodate the original restrictions. Consequently, to the extent that Plaintiff was "incapacitated" or "unable to work" for more than three days, it still was not *be-*

cause of her injury; rather it was because she told Dr. Campbell that Defendant refused to accommodate her work restrictions. *See, e.g., Olsen,* 979 F.Supp. at 1166 ("in order to show that he or she was 'required' to miss work for more than three days, a plaintiff employee must show that he or she was prevented from work *because of* the injury or illness based on a medical provider's assessment of the claimed condition ... it means that a 'health care provider' has determined that, in his or her professional medical judgment, the employee *cannot* work (or could not have worked) *because* of the illness.") (emphasis original). *See also Whitaker v. Bosch Braking Sys. Div. of Robert Bosch Corp.,* 180 F.Supp.2d 922, 930–31 (W.D.Mich.2001) (quoting *Olsen* in finding that the plaintiff there did meet that standard).

Hence, a reasonable jury could not find that Plaintiff has proven beyond a preponderance of the evidence that she suffered from a "serious health condition." Summary judgment, therefore, is appropriate regarding Bradley's claim that Mary Rutan violated the FMLA with regard to her own "serious health condition."

### 3. Plaintiff's Husband's Serious Health Condition

#### a. Entitlement to Take Leave

■ Likewise, to prove that she was entitled to take leave to care for her husband, Plaintiff must prove that Mr. Bradley suffered from a serious health condition. Mary Rutan disputes that Bradley has proffered sufficient evidence to create a genuine issue of material fact regarding both the seriousness of Plaintiff's husband's condition and her need to care for him.

Plaintiff posits that Mr. Bradley's Parkinson's Disease meets the definition of a chronic serious health condition as demonstrated by his doctor's affidavit. Furthermore, Plaintiff avers, it is disingenuous for

Mary Rutan to argue that Bradley was not needed to care for her husband on the days she took off because even Foor's notes indicate that Bradley took off on March 7, 2001, and sometime between March and June, because she was "needed" to care for her husband.

As discussed above, a serious health condition is an illness for which continuing treatment by a health care provider is required. Under the Department of Labor regulations:

A chronic serious health condition is one which:

(A) Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

(B) Continues over an extended period of time (including recurring episodes of a single underlying condition); and

(C) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

29 C.F.R. § 825.114(a)(2)(iii). Although Mary Rutan argues in its Memorandum in Opposition that there is no objective evidence that Mr. Bradley had Parkinson's Disease and/or that it had progressed to the stage of meeting the definition of a "serious health condition," the affidavit of Dr. Miguel Topalov, filed by Plaintiff in Reply, at least establishes a genuine issue of material fact. There, Dr. Topalov testifies that Mr. Bradley had Parkinson's Disease during the years of 2000–2001 and was in Stage Four of the disease. Dr. Topalov also explains that Mr. Bradley required periodic visits to his office and that Mr. Bradley suffered from episodes of more serious incapacities brought about by seizures associated with Parkinson's Disease. Thus, Plaintiff has offered evidence that Mr. Bradley's condition was a "chronic serious health condition."

Dr. Topalov's affidavit, additionally, discusses how Mr. Bradley required basic medical assistance, assistance with his personal needs, and assistance to ensure his safety from his family members during 2000–2001. Both Mr. and Mrs. Bradley also testified in their affidavits about the debilitating nature of Mr. Bradley's condition, especially on his "bad days" when Mr. Bradley is unable to perform basic life activities such as walking, preparing meals, going to the restroom by himself and feeding himself. Hence, Plaintiff has adduced evidence that she was *needed* to care for her husband.

#### b. Notice

The next issue is whether Bradley provided Mary Rutan with sufficient notice of her husband's condition. Defendant argues that the facts surrounding this issue are "hotly disputed." Indeed, Bradley claims that she told Foor during the interview process about her husband's Parkinson's Disease and informed Foor she would need time off to care for him and that Foor told her that would not be a problem. Mary Rutan, however, contends that Foor did not even interview Bradley and that Foor did not know that there was anything wrong with Mr. Bradley until *she* asked Plaintiff about it. It was not until in or around May 2001 that Foor became aware of Mr. Bradley's condition, Defendant insists.

██ It is well-settled that an employee has the affirmative duty to inform her employer of the need for leave and the reason. *Brohm v. JH Properties, Inc.,* 149 F.3d 517, 523 (6th Cir.1998); *Sanders v. May Dept. Stores, Co.,* 315 F.3d 940, 944 (8th Cir.2003). The employee, however, need not mention the FMLA by name,

"but is only required to give sufficient information to put the employer on notice that the leave may be FMLA-qualifying leave." *Cavin,* 346 F.3d at 723–24; *Whitaker,* 180 F.Supp.2d at 926. According to the Sixth Circuit, " '[t]he critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Brohm,* 149 F.3d at 523, quoting, *Manuel v. Westlake Polymers Corp.,* 66 F.3d 758, 764 (5th Cir.1995).

Once the employee does so, if the employee's request is unclear or if there is any doubt in the employer's opinion of the validity or need for the leave, it is the employer's burden to request more information. 29 C.F.R. § 825.302(c); *see also, Manns,* 291 F.Supp.2d at 662 ("Indeed, it is the employer's *duty* to investigate and verify that leave is or is not FMLA-qualifying.") (emphasis original); *Whitaker,* 180 F.Supp.2d at 926 (stating, "[i]f an employee's request is unclear, the employer is required to inquire further …"). Mary Rutan does not allege that it ever requested documentation or additional information from Bradley about Mr. Bradley's "illness" before Bradley formally requested FMLA leave in June of 2001.

There is a genuine issue of material fact that Foor was on notice that Mr. Bradley's condition was serious before March 7, 2001. In her affidavit, Foor avers that Bradley was not specific about her husband's illness during the first year of her employment. Foor's own notes, however, reflect that beginning November 9, 2000, and until January 29, 2001 (Plaintiff's last absence before she became eligible for FMLA leave), Plaintiff "called off" work on four (or six)[17] separate occasions (Novem-

---

17. Foor's notes state, "November 9–11th Carole called off due to Husbands illness," which does not make clear whether Bradley phoned *once* on the 9th and said she would be absent until the 11th due to her husband's condition, or if after Plaintiff called in for the third time on the 11th, Foor went back, retroactively,

ber 9, 2001(–11), November 14, December 20, and January 29, 2001)[18] and of those, Foor makes a notation with three of them that the reason was "due to Husbands [sic] illness," or "husband was sick."

While it may be argued that such vague statements are not sufficient to put an employer on notice, undoubtedly, the reference to an "illness" along with the frequency of absences attributable to the illness should suggest to a reasonable employer that the condition is not likely to be one of those minor illnesses unprotected by the FMLA.

Another indication of the seriousness of Mr. Bradley's condition is reflected in Foor's note regarding January 19, 2001. She writes, "Carole stated that she might need to be moved to part time status due to her husband needing care." Such a request compounds the conclusion that Mary Rutan may have received sufficient information to put it on notice that Plaintiff's absences might qualify under the FMLA after she became eligible in February of 2001. At the very least, a reasonable jury could conclude that Mary Rutan was required to seek further information once Bradley became an eligible employee. See, e.g., Manns, 291 F.Supp.2d at 660 ("once the employer is on notice of the need for leave, the employer has the duty to determine whether the leave was sought under the FMLA and to obtain additional information necessary to confirm that the leave complies with the FMLA.").

and made a notation that Plaintiff phoned in on each day and each time indicated that it was due to her husband's illness.

18. According to Foor's notes, Bradley also left work early on January 18 "due to husband's illness."

19. There also is a genuine issue of material fact regarding whether the warning(s) Brad-

### c. Employer's Unlawful Action(s)

The final element of Plaintiff's claim requires her to show by a preponderance of the evidence that Mary Rutan somehow used her FMLA-qualifying leave against her and in an unlawful manner, as proscribed by either the statute or regulations. Plaintiff's argument is that by using the absences she incurred to care for her husband after becoming eligible for FMLA leave in its decision to terminate her, Mary Rutan violated the FMLA. Defendant contends, however, that it made the decision to terminate Plaintiff after she abandoned her job by failing to report after two days of no-call, no-show.

As discussed above, an employer violates the FMLA when, after an employee takes leave protected by the FMLA,[19] it either: 1) discriminates against the employee for taking leave (§ 825.220(c)); or 2) uses the taking of FMLA leave as a negative factor in an employment action, such as discipline (§ 825.220(c)).

Throughout his deposition, Froebe is not certain of the exact dates of Plaintiff's September 2001 no-call, no-show absences, which is part of the dispute on Plaintiff's Motion to Strike. As ruled above, however, although Froebe could not remember the exact dates of Bradley's absences, he was consistent throughout his deposition and within his affidavit that Plaintiff's two days of "no-call, no-show absences" were the primary determining factor in his decision to terminate her.

ley received violated the FMLA. Mary Rutan's warnings could be said to have discouraged Plaintiff from taking leave she otherwise would have taken (or more of it) had she not feared continued warnings and/or termination for absences that arguably were protected under the FMLA. § 825.220(b). Because Plaintiff has offered no evidence, however, that she was so discouraged, the Court need not address this potential violation further.

What is troubling, however, is the inconsistency of Defendant's reasons for terminating Bradley. Mary Rutan claims in its Memorandum in Opposition that its termination of Plaintiff was unrelated to her FMLA leave [20] and that she was fired for failing to return to work and abandoning her job after her doctor released her. Froebe testified, too, that the decision to terminate Plaintiff was based on her two no-call, no-show absences in September of 2001. Throughout his deposition, however, when pressed by Plaintiff's counsel, Froebe admits that he considered Bradley's whole personnel file, including her "excessive absenteeism." In his affidavit, he states that, "[t]he fact that Carole Bradley had been reprimanded three times for tardiness and absenteeism, had been issued a 90–day warning, and had been marked low for absenteeism and tardiness on her evaluations further exacerbated her situation leading to her employment termination." Thus, despite some of Froebe's deposition testimony, there is evidence suggesting that Bradley's absences prior to those no-call, no-show days in September of 2001 may have played a part in Defendant's decision to terminate her.

In addition, Froebe claims not to have been aware that Mr. Bradley had Parkinson's Disease or that Plaintiff had taken time off, allegedly, to care for her husband. Froebe admits, however, that he considered Plaintiff's full personnel file, including notes of her supervisor and that he had extensive discussions with Foor,[21] who, arguably, was aware of Mr. Bradley's condition and the fact that Plaintiff's absences might have qualified for FMLA leave.

Moreover, rather than relying on stale memories of witnesses, the September 28, 2001, letter from Froebe to Bradley also suggests that the decision may have been, in part, based on Plaintiff's history of absenteeism. In his letter, Mr. Froebe writes, "[a]s a result of your *continued absenteeism* coupled with your refusal to return to work from leave, you [sic] actions are inexcusable and you have abandoned your job. Therefore, your employment with Mary Rutan Hospital has been terminated." The job abandonment excuse seems related only to Plaintiff's September 2001 absences. But, in the same sentence, Froebe also cites Plaintiff's "continued absenteeism," arguably as part of the justification for terminating Bradley.

Thus, whether the March 7, 2001, absence was considered part of her "continued absenteeism" is a genuine issue of material fact. If it was part of the decision-making process, then a reasonable jury could conclude that either Defendant "discriminated" against Bradley for taking leave to care for her husband or that Mary Rutan used the leave as a "negative factor" in its decision to terminate her. *See, e.g., Cavin,* 346 F.3d at 726 ("a termination based only in part on an absence covered by the FMLA, even in combination with

---

**20.** Of course, Defendant also contends that Plaintiff's only FMLA-qualified leave was the one for which she formally requested and was approved for from June 13, 2001 to July 13, 2001. The Court, however, having determined that there is a genuine issue of material fact regarding whether Plaintiff's March 7, 2001 absence, at least, qualifies under the FMLA, finds that there is a genuine issue of material fact regarding whether Plaintiff's termination, indeed, was unrelated to all of the absences that might qualify for FMLA leave (as for example, Plaintiff's March 7, 2001

absence would if a jury were to determine that Plaintiff's notice for such absence was sufficient).

**21.** For example, in his testimony, Froebe admits that in his discussion with Foor, "[w]e look[ed] at her record, the overall absenteeism, the overall substandard performance and the fact that she had two days of no-call, no-show when she was scheduled to return to work. That essentially made it a very clear cut termination." Froebe Depo., p. 36, ln. 15–19.

other absences, may still violate the FMLA.") (citation omitted).

It simply is not clear from the letter, Froebe's deposition testimony, or the other evidence before this Court whether, and to what extent, Plaintiff's arguably FMLA-protected absences in relation to her husband's condition may have been used in Mary Rutan's decision to fire Bradley. If by "continued absenteeism," Froebe was referring only to the many absences Bradley had before she became eligible for FMLA leave and/or any of Bradley's other absences that she did not claim as being for the purpose of caring for Mr. Bradley, then Defendant could be found not to have violated the FMLA for terminating Plaintiff, since it is undisputed that Bradley's no-call, no-show absences in September of 2001 were a sufficient basis for terminating her under Defendant's policies.

Because the overall evidence is conflicting, summary judgment is not appropriate for either party. Undoubtedly, there are genuine issues of material fact remaining for trial.

## VI. CONCLUSION

Based on the foregoing analysis, the Court **DENIES** Plaintiff's Motion to Strike and **DENIES** both Plaintiff's and Defendant's Motions for Summary Judgment.

**IT IS SO ORDERED.**